STATE OF CONNECTICUT *v.* DOWEN D. PHILLIPS
(AC 25281)

Schaller, DiPentima and McLachlan, Js.

Argued October 10, 2006—officially released July 31, 2007

*Matthew J. Collins*, special public defender, for the appellant (defendant).

*John A. East III*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Sandra L. Tullius*, senior assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, J. In all criminal prosecutions, the defendant has the right to a trial by an impartial jury.

U.S. Const., amend. VI; Conn. Const., art. I, § 8. Allegations of racial bias on the part of jury members strike at the heart of that right. In this appeal, we primarily address the claim by the defendant, Dowen D. Phillips, that the trial court improperly denied his motion for a new trial following a hearing that revealed evidence of possible racial bias on the part of a juror.

Our reading of *State* v. *Santiago*, 245 Conn. 301, 336, 715 A.2d 1 (1998), in which our Supreme Court instructed that evidence of racial bias is ipso facto prejudicial, as well as the long-standing precedent preventing any intrusion into the deliberations of the jury, leads us to conclude that the trial court applied an improper legal standard to the defendant's motion. The court improperly based its denial of the defendant's motion on its conclusion that the defendant had not suffered actual prejudice because there was no evidence that anything improper had affected the jury's verdict. Instead, the court should have restricted its inquiry of the jury to a solicitation of objective facts relating to the allegations, including statements heard and conduct observed, and should not have inquired into the effect of those facts on each juror's deliberations. The court should then have made an independent determination as to whether the evidence before it revealed racial bias on the part of a juror. Accordingly, we remand the case for a determination on the defendant's motion for a new trial as to whether there was racial bias on the part of a juror against the defendant. If the court does find that a juror is racially biased, through speech or conduct, such conduct is ipso facto prejudicial and the defendant is entitled to a new trial. The defendant additionally claims that the court improperly admitted evidence of his prior convictions and youthful offender status. With respect to those claims, we affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On April 11, 2001, Linda Young left the Brian Thomas Candy and Tobacco Company in West Hartford, which she owned and operated with her husband, intending to deposit the daily receipts at Farmington Savings Bank. The deposit bag contained more than $26,000 in cash and more than $80,000 in checks. As she was walking across the parking lot toward her car, a man approached and ripped the bag of money from her, knocking her to the pavement in the process. The robber ran down the street and got into the passenger seat of a green Plymouth Caravan. The police tracked down the driver of the Plymouth, who claimed that the defendant was the robber and had offered him $300 to act as the getaway driver. The defendant was arrested on June 21, 2001, and subsequently released on a $30,000 bond. The defendant was scheduled to appear in court on August 1, 2001. He was not present in court when his case was called on that date. The court recalled his bond and issued a rearrest order. The defendant was rearrested on October 17, 2001.

The defendant was charged in a six count amended information with robbery in the third degree in violation of General Statutes § 53a-136, larceny in the first degree in violation of General Statutes § 53a-122 (a) (2), conspiracy to commit robbery in the third degree in violation of General Statutes §§ 53a-48 and 53a-136, conspiracy to commit larceny in the first degree in violation of General Statutes §§ 53a-48 and 53a-122 (a) (2), larceny in the second degree in violation of General Statutes § 53a-123 (a) (3) and failure to appear in the first degree in violation of General Statutes § 53a-172 (a) (1). The defendant elected to be tried by jury, which was comprised of six members. Following eight days of deliberation, the jury returned a verdict of guilty on the failure to appear count. With respect to the other

counts, no verdict was returned and a mistrial was declared.

On March 18, 2003, the defendant filed a motion for an evidentiary hearing concerning jury misconduct on the basis of mistake of fact, which was denied on April 8, 2003. The defendant amended his claims on the same day to include jury racial bias. The court held evidentiary hearings on that issue on April 29 and May 7, 2003. The court conducted an extensive inquiry of the juror reporting the conduct, of the juror alleged to have made racist remarks and also of the four other jury members who would have witnessed the alleged conduct. The hearings were on the record and each juror testified outside the presence of the other jury members. Included in the court's questions was whether anything inappropriate transpired during the deliberations and whether anything inappropriate influenced the jurors' verdict.

Four of the jurors testified that they believed juror B[1] to be racially prejudiced against the defendant, who is a black man.

Juror H, a black man, testified that juror B, a white man, made racist remarks to him. Juror H also reported that juror B told him that "when he saw [the defendant] he made up his mind that [the defendant] was guilty because of his demeanor. . . . He said when he first saw [the defendant], he knew—he knew that he was guilty." According to juror H, juror B made reference to the fact that a person alleged to be part of the crime was Puerto Rican and to the way that "those people treat their women," and also made a comment to one of the jurors of Vietnamese origin.[2] Juror B also asked

---

[1] We refer to the jurors by initial to protect their legitimate privacy interests. See, e.g., *State* v. *Gardner*, 96 Conn. App. 42, 56 n.7, 899 A.2d 655, cert. denied, 280 Conn. 906, 907 A.2d 92 (2006).

[2] According to juror H, juror B said, "oh, is that a Vietnamese custom?" Juror H, however, could not recall the context of the comment.

juror H why he had big feet. Juror H stated that juror B was very difficult to interact with and that it reached the point where juror H did not want to attend court any longer. In response to the judge's question whether juror B's conduct influenced his verdict, juror H stated, "yes, trying to get him to see the other part of the case." He also said that "it was a compromise on my behalf."

Juror K, another black member of the jury, testified that he believed that juror B was racist. He said, "you didn't hear the word nigger in that room, but you could feel it."

Juror M, the jury foreperson, testified that juror B made inappropriate comments of a racial nature during deliberations, including asking the black jurors questions that did not belong in the jury room, questions that he did not ask of the other jurors. Juror M also testified that juror B's particular racial bias against the defendant presented some confusion in the room that may have affected the jurors' ability to deliberate openly and fairly. Juror M said, "I think that we came to the decision that we could no longer go forward [and that] was because of the . . . I believe and we all believe . . . the racial bias by [juror B] in the room."

Juror R confirmed that one of the jurors made racially motivated comments and that his conduct caused the other jury members to ask him whether "he had racial problems."

When he testified at the postverdict hearing, juror B acknowledged the racial overtones throughout the jury's deliberations. He testified that two members of the jury called him a racist. He said that during deliberations, he commented about the defendant's demeanor at a certain stage in the trial and that as a result, "I was told I was a racist because black people and people of minority are more apt to demonstrate with their hands and to say things like that." Juror B also believed that

indirect threats were made to him. Juror B testified that juror K at one point said "something along the lines [of], 'Boy, if this was a basketball game, I'd beat the shit out of him,' or something like that."

Juror C did not remember anything inappropriate transpiring in the jury room.

Following the hearings, the court issued a memorandum of decision in which it found all of the jurors' testimony to be credible. It then went on to hold that "there is no evidence that any comments attributed to [juror B] compromised the jury in any way" and that "there is nothing in the evidence to suggest that their individual verdict was based on anything other than the facts and the law." The court therefore denied the defendant's motion for a new trial, which alleged juror racial bias. On January 9, 2004, the defendant was sentenced to five years imprisonment, execution suspended after three years, to be followed by a five year period of probation. This appeal followed.

I

The defendant claims on appeal that the court improperly denied his motion for a new trial, which alleged jury racial bias. The standard of review in an appeal challenging a ruling on juror misconduct is well settled. "We have limited our role, on appeal, to a consideration of whether the trial court's review of alleged jury misconduct can fairly be characterized as an abuse of its discretion. . . . Even with this circumscribed role, we have reserved the right to find an abuse of discretion in the highly unusual case in which such an abuse has occurred. . . . The trial judge's discretion, which is a legal discretion, should be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice." (Citations omitted; internal quotation marks omitted.) *State* v. *Brown*, 235 Conn. 502, 524,

668 A.2d 1288 (1995); see also *State* v. *Santiago*, supra, 245 Conn. 336.

"Jury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution. . . . [T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . The modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court. . . . [Article first, § 8, and the sixth amendment require] that a criminal defendant be given a fair trial before an . . . unprejudiced jury . . . ." (Internal quotation marks omitted.) *State* v. *Wilson F.*, 77 Conn. App. 405, 422, 823 A.2d 406, cert. denied, 265 Conn. 905, 831 A.2d 254 (2003).

Although any misconduct on the part of the jury is lamentable, our Supreme Court has recognized that such misconduct is all the more grave when the cause is said to be racial bias. Thus, in *State* v. *Santiago*, supra, 245 Conn. 301, it instructed that "[a]llegations of racial bias on the part of a juror are fundamentally different from other types of juror misconduct because such conduct is, ipso facto, prejudicial . . . ." Id., 336.[3]

[3] The test generally used for granting a new trial on the basis of juror misconduct is "whether there was actual prejudice to the defendant." *State* v. *Anderson*, 255 Conn. 425, 445, 773 A.2d 287 (2001). In such cases, the question is whether the misconduct has prejudiced the defendant to the extent that he has not received a fair trial. Id. The *Santiago* court reasoned that a distinction is warranted in cases alleging racial bias on the part of a juror because juror misconduct involving exposure to extrinsic material such as a dictionary or newspaper or involving the deliberation process such as presubmission discussion among the jurors does "not pose the level of seriousness and likelihood of prejudice to the defendant as a juror who is racially biased." *State* v. *Santiago*, supra, 245 Conn. 336 n.21.

In *Santiago*, the jury found the defendant guilty of murder. Approximately one month after the verdict had been returned, a juror claimed that during deliberations, a male juror had made ethnically biased statements in an attempt to persuade the other jurors of the defendant's guilt, including: "What do you care about a spic?" "Let's get one more spic off the streets of Willimantic," and, "Of course he's guilty, he's a spic." (Internal quotation marks omitted.) Id., 326. She also claimed that she had been pressured by the other jurors to find the defendant guilty. Id., 325 n.15. The trial court limited its preliminary investigation into those allegations to an inquiry of the jury foreperson, who testified that he did not recall any jurors making ethnic slurs. Id., 327–28. On the basis of that testimony, the trial court deemed the allegations not credible. Id., 329.

On appeal, our Supreme Court held that although the trial court had not abused its discretion under the existent state of the law,[4] it should have conducted a more extensive inquiry to ensure that the allegations truly lacked credibility. The court therefore exercised its supervisory authority over the administration of justice to provide additional guidelines for trial courts to use when conducting inquiries into allegations of juror misconduct in criminal cases. Id., 340. The court held that the trial courts' hearings include, "at a minimum, an extensive inquiry of the person reporting the conduct, to include the context of the remarks, an interview with any persons likely to have been a witness to the alleged conduct, and the juror alleged to have made the remarks." Id. The case was remanded to the trial court for such hearings.

[4] Prior to *Santiago*, trial courts deciding allegations of juror misconduct in criminal trials were guided by *State* v. *Brown*, supra, 235 Conn. 502. In that case, our Supreme Court instructed the trial courts to conduct a preliminary inquiry into all allegations of juror misconduct in criminal trials, regardless of whether an inquiry is requested by counsel. Id., 526. It left the form and scope of the inquiry, however, to the discretion of the judge. Id.

On remand, the trial court heard testimony from all of the remaining jurors, found the claims of ethnic bias not credible and denied the defendant's motion for a new trial. Our Supreme Court affirmed the trial court's decision in a per curiam opinion because it concluded that the trial court's credibility determinations were not clearly erroneous. *State* v. *Santiago*, 252 Conn. 635, 640–41, 748 A.2d 293 (2000).

We recognize the delicate and complex task of investigating reports of juror bias and, in this case, the trial court's compliance with the procedural strictures of *Santiago*. We conclude, however, that the court applied an incorrect legal standard to its inquiry. Rather than require that the defendant prove actual prejudice, the court should have proceeded in accordance with *Santiago*. To do so, it need not, and should not, have asked jurors whether anything improper had influenced their verdict. It should have instead restricted its inquiry to objective evidence of racially related statements and behavior.[5] The court should then have decided whether that evidence amounted to racial bias against the defendant on the part of one or more jurors, which would have automatically warranted a new trial. See *State* v. *Santiago*, supra, 245 Conn. 336.

As a general matter, jury verdicts are insulated from impeachment by jury testimony. See *Tanner* v. *United States*, 483 U.S. 107, 117, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987). Our Supreme Court has drawn an exception to this rule for cases of jury misconduct. In *State* v.

---

[5] We recognize that the court will often, as it did in this case, reap more information than it properly should consider within the narrow confines of this inquiry. The court should take caution to distinguish between jurors' description of the statements and behavior of an allegedly biased juror, and jurors' opinions as to the meaning and motivation underlying such statements and behavior. See Practice Book § 16-34; *Hamill* v. *Neikind*, 171 Conn. 357, 361, 370 A.2d 959 (1976); *Aillon* v. *State*, 168 Conn. 541, 550–52, 363 A.2d 49 (1975).

*Brown,* supra, 235 Conn. 526, it held that in all criminal cases, when jury misconduct is alleged, the court must hold a preliminary inquiry on the record. In *State* v. *Santiago,* supra, 245 Conn. 338, the court provided additional guidance to trial courts with respect to who must be called to testify. Beyond those parameters, it left the form and scope of the inquiry to the discretion of the trial courts. Trial courts, however, are also limited by Practice Book § 16-34, which provides that "[u]pon an inquiry into the validity of a verdict, no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror nor any evidence concerning mental processes by which the verdict was determined. Subject to these limitations, a juror's testimony or affidavit shall be received when it concerns any misconduct which by law permits a jury to be impeached." This provision codified a rule that had been adopted in preceding jurisprudence. See *Aillon* v. *State,* 168 Conn. 541, 551–52, 363 A.2d 49 (1975) (admission of juror testimony regarding ex parte communication between juror and judge does "not implicate the mental processes of the jurors as long as they were prevented from giving evidence of the actual effect that it had on their minds"); see also *Hamill* v. *Neikind,* 171 Conn. 357, 361, 370 A.2d 959 (1976) ("[i]n *Aillon,* [our Supreme Court] ruled that jurors were competent to testify to the occurrence of incidents during trial or during their deliberations which might have affected the result of the trial, but could not testify as to the impact of such incidents on their verdict").[6]

[6] This rule also has a federal counterpart. Rule 606 (b) of the Federal Rules of Evidence provides: "Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the

Significant policy considerations underlie this rule, recognized by the United States Supreme Court as early as 1915. "[L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference." *McDonald* v. *Pless*, 238 U.S. 264, 267–68, 35 S. Ct. 783, 59 L. Ed. 1300 (1915). The dubiousness of such testimony is also cause for concern. "Since inquiry into the thought processes of any individual is at best speculative and the cases suggest that it is relatively easy to convince a juror that he has acted mistakenly, a judge's ability to reconstruct the juror's thoughts at the time of his deliberation is doubtful and unverifiable." (Internal quotation marks omitted.) *Wright* v. *United States*, 559 F. Sup. 1139, 1151 (E.D.N.Y. 1983), aff'd, 732 F.2d 1048 (2d Cir. 1984), quoting 3 J. Weinstein & M. Berger, Weinstein's Evidence (1981) ¶ 606[03], p. 606-24. Thus, although courts accept testimony of jurors concerning improper outside influences, they "have consistently refused to consider statements by jurors relating either to the subjective effect such influences might have had

verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying."

Rule 606 (b) was amended in 2006. Because the amendment did not affect the substance of the rule relative to the issue before us, we refer to the current version of the rule.

on them or to the mental process through which they arrived at their verdict." *United States* v. *Green*, 523 F.2d 229, 235 (2d Cir. 1975), cert. denied, 423 U.S. 1074, 96 S. Ct. 858, 47 L. Ed. 2d 84 (1976).

Our recent jurisprudence has not dispensed with this rule. Neither *Brown* nor *Santiago* instructs courts to inquire into the effect of racial prejudice on jurors. Moreover, the language in *Santiago* obviates the need for such an inquiry, for if evidence of racial bias is ipso facto prejudicial, there is no need to inquire into its effect.

Our task in this case is to strike an extremely delicate balance between preserving the sanctity of the jury's deliberative process and ensuring that racial prejudice has no place in the jury room. We must be vigilant in making sure that our trial courts, in conducting postverdict inquiries, proceed cautiously so as not to delve into the deliberative process while at the same time fully inquire into the context and circumstances surrounding the allegations of racial bias.

In *Santiago*, a juror was alleged to have referred to the defendant specifically by a derogatory racial term and appealed to other jurors to consider the defendant's ethnicity in returning their verdict. The record presently before the court does not reveal such direct statements specifically referring to the defendant. In this case, the statements and conduct in question involved jurors of the same race as the defendant, as well as a juror of Vietnamese origin and a Puerto Rican man alleged to be part of the crime. Under our reading of *Santiago*, if the court finds that a juror displayed racial bias toward other jurors of the same race as the defendant, such juror would not be able to impartially judge the guilt of the defendant.[7]

---

[7] We further think that in order to root out this most invidious form of juror bias, a trial court has the discretion to conclude that certain other manifestations of racial bias, such as racial bias toward another juror, would be ipso facto prejudicial to the defendant.

We conclude that the court should have restricted its inquiry of the jury to a solicitation of objective facts relating to the allegations, including statements heard and conduct observed, and should not have inquired into the effect of those facts on each juror's deliberations. The court should then have made an independent determination as to whether the evidence before it revealed racial bias on the part of a juror.

The case is remanded for a determination on the defendant's motion for a new trial as to whether there was racial bias on the part of a juror against the defendant. If the court does find that a juror is racially biased, through speech or conduct, such conduct is ipso facto prejudicial, and the defendant is entitled to a new trial.

## II

The defendant additionally claims that the court improperly permitted the state to impeach him using evidence of a prior misdemeanor conviction and a pending charge for the same crime for which he was being tried, as well as evidence of his prior use of the youthful offender program. The defendant primarily argues that the prejudicial effect of admitting the evidence outweighed its probative value. We disagree.

The following additional facts are relevant to our resolution of the defendant's claim. At trial, the defendant testified in his defense. The following is his account of the events underlying the failure to appear charge. On the scheduled date, the defendant was in court but had momentarily stepped out of the courtroom. When he tried to reenter the courtroom, a marshal standing in front of the door told the defendant that the courtroom was closed for a youthful offender proceeding. In relation to the youthful offender proceeding, the defendant testified that he "really didn't know what that really was about." The defendant reentered the courtroom as soon as the doors were opened

and resumed waiting, but court eventually adjourned without his hearing his case being called. He therefore approached the court marshal, who informed the defendant that his case had been called earlier that day and directed him to the clerk's office to resolve the issue. A woman in the clerk's office confirmed that the defendant's case had been called and told the defendant that she did not have the proper paperwork but instructed him to return to court the next day. The defendant returned to the courtroom the following day, but again his name was not called. He again went to the clerk's office, where he was informed that he had a failure to appear and that his bond had been called. The defendant testified that he thought he would be sent a bail commissioner's letter and given a new court date. The defendant stated that he did not really know what a bail letter was but that the woman in the clerk's office had explained to him that if his name is called in court and he is not there, he would be sent a letter and given a new court date.[8]

During cross-examination, the state sought to impeach the defendant's testimony with evidence of his prior conviction and pending charge of failure to appear, as well his prior usage of the youthful offender program. Outside of the presence of the jury, the state argued that by claiming ignorance, the defendant had opened the door to the admission of evidence related to his familiarity with court procedures, including his previous failures to appear and his experience with the youthful offender program.[9] The court ruled that the

---

[8] The defendant also testified that he telephoned the bondsman, who told him to just wait for his court date and not to miss the next one.

[9] The state argued: "In the context of the failing to appear, this is not a conviction that the state felt it could get [into evidence] until the defendant testified as to the fact that he wasn't aware of the procedures of what he was supposed to be doing, and the fact that he's supposed to be back in court, and all these other—other things he testified to. He has got a conviction for it. Additionally, again, the defendant testified, quite extensively, to the fact that he was not familiar with the court process. . . . There—there are

state could ask the defendant whether he was familiar with the youthful offender program. With respect to the defendant's prior and pending failure to appear charges, the court ruled that the state could ask whether the defendant came to court when he was supposed to and could test his knowledge of the system and procedure used in court dockets during the day. The court, however, ordered the state not to mention a conviction for failure to appear or the words "failure to appear" in succession.[10]

When cross-examination resumed, the state asked the defendant about his use of the youthful offender program in 1990 and 1991 and about prior cases in which he had previously not come to court and was incarcerated as a result.[11] The court instructed the jury that it was to consider this evidence only to test the defendant's knowledge of court procedures and not to draw any inferences about his propensity to commit offenses.[12] During its questioning, the state used the words "failing to appear."[13]

numerous times when this defendant has had court dates, [and] he failed to appear on those court dates."

[10] The court reasoned that "certainly, the state can get into his familiarity with the court system. When he claims, I don't know what to do . . . he's coming across as—it may be perfectly candid, as a babe in the woods. I think the state should be given some latitude."

[11] The defendant denied being familiar with the youthful offender procedure and responded in the negative to the state's question about whether he recalled utilizing the program himself in 1990 and 1991.

[12] The court gave the following limiting instruction: "The area of this inquiry, and I've allowed this inquiry, is for a limited purpose only, and I don't want the—and I'll indicate to you, when I instruct you, but it's not for the purposes of trying to demonstrate this young man had other cases or is in any way culpable in anything else. It's simply limited, and I'll instruct you more carefully later on. It's simply limited to test this gentleman's knowledge of the court docket and court system, and for no other reason. And it's not—also not offered to show that he has any propensity for—offenses or anything of that nature. It's simply limited to test the gentleman's familiarity with how the court system operates, period. And when I give you a limited instruction, you're bound by that."

[13] The state asked the defendant, "And didn't you also plead guilty, at that time, to failing to appear?"

The defendant admitted to not coming to court as he was supposed to on January 23 and August 7, 2001. Although the court agreed with defense counsel that the state had violated its order by asking about the failure to appear conviction, the court nevertheless denied a defense motion for a mistrial because it found that the defendant could still be assured a fair trial. At the conclusion of the trial, the court again instructed the jury on the limited purposes for which it could consider evidence of the defendant's prior failures to appear.

We note that our review of a trial court's evidentiary ruling is limited. "Evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. . . . In considering whether the trial court abused its discretion, the unquestioned rule is that great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Coughlin*, 61 Conn. App. 90, 95–96, 762 A.2d 1 (2000), cert. denied, 255 Conn. 934, 767 A.2d 105 (2001). "It is well established that the trial court has discretion on the admissibility of prior convictions. In such instances, the test is whether the prejudicial effect of the evidence did not outweigh its probative value." (Internal quotation marks omitted.) *State* v. *Denby*, 35 Conn. App. 609, 620, 646 A.2d 909 (1994), aff'd, 235 Conn. 477, 668 A.2d 682 (1995). Furthermore, we have repeatedly stated that "[w]hile the remedy of a mistrial is permitted under the rules of practice, it is not favored. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . The general rule in Connecticut is that a mistrial is granted only where it is apparent to the court that as a result of some occurrence during trial a party has been denied the opportunity for a fair

trial. . . . The trial court enjoys wide discretion in deciding whether a mistrial is warranted . . . and its evaluation as to events occurring before the jury is to be accorded the highest deference. . . . Every reasonable presumption will be given in favor of the trial court's ruling . . . because the trial court, which has a first-hand impression of the jury, is in the best position to evaluate the critical question of whether the . . . jurors' exposure has prejudiced a defendant." (Internal quotation marks omitted.) *State* v. *Aponte*, 66 Conn. App. 429, 450, 784 A.2d 991 (2001), cert. denied, 259 Conn. 907, 789 A.2d 995 (2002).

A

The defendant claims that a mistrial was warranted because the admission of evidence relating to his conviction and pending charge for failure to appear was unduly prejudicial.[14] The state responds that the defendant opened the door to the admission of the evidence and therefore cannot complain that it was used against him.[15] We agree with the state.

Evidence that a criminal defendant has been convicted of crimes on prior occasions generally is not

[14] The defendant additionally argues that a failure to appear conviction is only a misdemeanor, whereas our case law permits the admission of prior convictions for impeachment purposes only when the maximum penalty for the conviction is imprisonment in excess of one year. See *State* v. *McDermott*, 190 Conn. 20, 25, 458 A.2d 689 (1983). Contrary to the defendant's argument, because we conclude that he opened the door to such evidence, it was within the court's discretion to admit it, even though it was a misdemeanor offense. See *Lo Sacco* v. *Young*, 20 Conn. App. 6, 14–15, 564 A.2d 610 (affirming trial court's ruling allowing state to impeach defendant with prior misdemeanor conviction because defendant had opened door), cert. denied, 213 Conn. 808, 568 A.2d 793 (1989).

[15] The state also argues that the evidence was admissible to prove an essential element of the crime, which was that the defendant acted wilfully, and that it was admissible under the exception allowing the state to admit evidence of a defendant's prior conviction to prove a defendant's knowledge. Because we conclude that the defendant opened the door to the admission of his prior failures to appear, we need not decide whether the evidence was also admissible under these theories.

admissible. *State* v. *Geyer*, 194 Conn. 1, 5, 480 A.2d 489 (1984). When, however, a party opens the door to a subject that pertains directly to the credibility of the witness, he does so at his own risk. *State* v. *Johnson*, 29 Conn. App. 584, 588, 617 A.2d 174 (1992), appeal dismissed, 228 Conn. 59, 634 A.2d 293 (1993). In such cases, "the rule is that a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject." (Internal quotation marks omitted.) Id.; see also *State* v. *Graham*, 200 Conn. 9, 13, 509 A.2d 493 (1986) ("[t]he party who initiates discussion on the issue is said to have 'opened the door' to rebuttal by the opposing party"). "Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence. . . . The doctrine of opening the door cannot, of course, be subverted into a rule for injection of prejudice. . . . The trial court must carefully consider whether the circumstances of the case warrant further inquiry into the subject matter, and should permit it only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence. . . . [I]n making its determination, the trial court should balance the harm to the state in restricting the inquiry with the prejudice suffered by the defendant in allowing the rebuttal." (Citations omitted; internal quotation marks omitted.) *State* v. *Graham*, supra, 13–14.

We agree with the court's ruling that once the defendant made his unfamiliarity with court procedures the fulcrum of his defense, the state was entitled to ask to him about his prior experiences in failing to appear for a scheduled court date. On direct examination, the defendant testified generally as to his unfamiliarity with court procedures and directly stated that he did not

know anything about bail letters or the youthful offender program and that he had simply done as he was told by the court clerk. The state sought to rebut the defendant's claim of ignorance by showing that the defendant should have known that he would not receive a bail letter from the court clerk. The court properly balanced the prejudicial harm that might befall the defendant by admitting evidence of his prior convictions against the unfairness to the state if the state's hands were tied and could not impeach his claim of ignorance. In balancing these factors, the court ultimately found that the state would be unduly prejudiced if it were denied the opportunity to impeach the defendant's testimony as to his ignorance. The court was well within its discretion to so conclude. See *State* v. *Denby*, supra, 35 Conn. App. 622.

The reason underlying the "opening the door doctrine" is to "[p]revent a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage, without allowing the prosecution to place the evidence in its proper context." (Internal quotation marks omitted.) *State* v. *Johnson*, supra, 29 Conn. App. 588. If a defendant claims ignorance as to certain facts when the admission of his prior misconduct would prove his knowledge, he has made unfair use of this evidence, and the state has the right to counter his assertions.

In *State* v. *Johnson*, supra, 29 Conn. App. 584, we upheld the trial court's ruling that the defendant had opened the door to impeachment with his prior conviction of possession of narcotics with intent to sell when he testified that he did not sell drugs to maintain his lifestyle. Id., 589. We reasoned that his testimony had "suggested the nonexistence of the defendant's prior conviction" and "squarely implicated the defendant's credibility." Id.; accord *State* v. *Denby*, supra, 35 Conn.

App. 622. In this case, the defendant's testimony that he believed the clerk when she told him that he would get a bail letter suggested that he did not have experience with the procedure that ensues when one misses his court date. Thus, the defendant's testimony similarly suggested the nonexistence of his prior conviction and squarely implicated his credibility. Accordingly, we conclude that it constituted evidence with which he could permissibly be impeached.

The defendant additionally argues that according to *State* v. *Geyer*, supra, 194 Conn. 1, and *State* v. *Wright*, 198 Conn. 273, 502 A.2d 911 (1986), evidence of a defendant's prior conviction for the same crime for which he is being tried is per se overly prejudicial and, consequently, can never be admitted for impeachment purposes. Our case law holds otherwise. We have certainly recognized that a high degree of prejudice can be expected when the prior crime is quite similar to the crime charged because of the jury's tendency to believe that if the defendant did it before, he probably did it again. *State* v. *Carter*, 189 Conn. 631, 644, 458 A.2d 379 (1983). In *State* v. *Denby*, supra, 35 Conn. App. 609, however, we recognized the limits of *Geyer*, stating that "[t]he court did not hold that if a defendant had a prior conviction or convictions similar to the pending charges, evidence of those convictions [was] inadmissible as a per se rule." Id., 621; see also *State* v. *Rivera*, 221 Conn. 58, 74, 602 A.2d 571 (1992) ("we note that the language in *Geyer* suggesting that the crime be referred to as an 'unspecified' felony conviction is permissive not mandatory"). Furthermore, this court has previously concluded that when a defendant has opened the door to evidence of his prior convictions, he cannot rely on *Geyer* to then claim that the evidence was overly prejudicial. See *State* v. *Johnson*, supra, 29 Conn. App. 589.

We finally note that the court went to great lengths to minimize potential prejudice to the defendant by instructing the state not to name the conviction or even mention the words "failure to appear" in succession and by providing instructions to the jury on the limited purpose for which it permissibly could consider the evidence. Although the state did violate the court's order, the infraction was minor, and the court concluded that the defendant could still be assured a fair trial. Applying our standard of review in this case, we cannot say that the court, after balancing the probative value against the potential prejudice, abused its discretion when it allowed the state to impeach the defendant's testimony with evidence of his prior convictions and pending charge of failure to appear.

B

The defendant also claims that the court erred when it allowed the state to impeach him with evidence that he had used the youthful offender program.[16] In support of his claim, the defendant argues that youthful offender adjudications are not proper convictions for purposes

[16] The defendant additionally argues that his youthful offender conviction was too remote in time to introduce into evidence. Although in Connecticut, we have adopted ten years as the general benchmark for determining when a crime is too remote to be presented to the jury, this is not a strict rule binding trial courts. See State v. Carter, 228 Conn. 412, 431, 636 A.2d 821 (1994) ("we have left to the trial court the responsibility for determining whether, in a particular case, a witness' criminal conviction may be excluded on the grounds that it is too old"). Furthermore, we have recognized that "convictions having some special significance upon the issue of veracity surmount the standard bar of ten years and qualify for the balancing of probative value against prejudice." (Internal quotation marks omitted.) State v. Cooper, 227 Conn. 417, 436, 630 A.2d 1043 (1993). In this context, the evidence did have a special significance regarding the defendant's veracity, for the admission of this evidence would directly contradict his testimony that he did not know anything about the youthful offender program. The court, therefore, had the discretion to determine that the evidence was not too remote to be admitted.

of impeachment.[17] Although the defendant is correct that a youthful offender adjudication is generally inadmissible for impeachment purposes, we conclude that in this instance, the evidence was admitted properly.

Youthful offender treatment is not a "criminal conviction" in Connecticut and therefore generally cannot not be admitted as a prior conviction with which to impeach a criminal defendant. *State* v. *Keiser*, 196 Conn. 122, 128, 491 A.2d 382 (1985). In this case, however, the state did not attempt to impeach the defendant's general credibility by raising his status as a youthful offender or the subject matter of the convictions underlying that status. On direct examination, the defendant specifically testified that he was not able to get back into the courtroom after a temporary absence because of a youthful offender proceeding and claimed not to know "what that was really all about."[18] The failure to appear charge put in question the defendant's presence in the courtroom that day. The defendant's testimony could have left the jury with the false impression that he had no way of knowing that courtrooms are closed during youthful offender proceedings unless he was telling the truth about being in court that day and had been informed of the procedure by the marshal. The defendant's prior knowledge of youthful offender proceedings was therefore crucial to the state's case and is precisely the type of misleading impression that the

---

[17] General Statutes § 54-76k provides in relevant part that "no youth shall be denominated a criminal by reason of such determination [of youthful offender status], nor shall such determination be deemed a conviction."

[18] The defendant testified:

"[Defense Counsel]: Okay. Now, did you try to get—did you see that the courtroom was closed?

"[The Defendant]: Yes. Um, after I stepped out, when I tried to return into the courtroom, there was a sheriff—a marshal out in front, and he was, like, the court has been cleared for, um, [youthful offender]—a [youthful offender] docket. I really didn't know what that really was about. But he was, like, we will open up the courtroom—I don't know what time he said, but they would open the courtroom again."

opening the door doctrine is meant to rectify. See *State v. Graham*, supra, 200 Conn. 13. Thus, the court properly determined that the defendant had opened the door to questioning by the state as to whether he had used the youthful offender program before so as to contradict his statement that he did not know what it was about. The state did not refer to the defendant's use of the program as a "conviction," nor did it reveal the underlying offense. We conclude that the evidence regarding the defendant's prior use of the youthful offender program, therefore, was admissible for all of the same reasons as were his prior convictions for failure to appear.

The denial of the motion for a new trial is reversed and the case is remanded to the trial court, *Miano, J.*,[19] for a determination, on the existing record, of the motion for a new trial, including a finding as to whether there was racial bias on the part of a juror against the defendant.

In this opinion McLACHLAN, J., concurred.

SCHALLER, J., concurring. Although I concur in the result reached by the majority, I write separately to emphasize several points with respect to the majority's analysis of the issues presented in parts I and II B.

First, with respect to part I, I agree that the trial court improperly required the defendant, Dowen D. Phillips, to prove actual prejudice in order to prevail on his claim of jury racial bias, and I agree with the remand of the case for a determination of whether the evidence in the

---

[19] We are cognizant of Practice Book § 1-22 (a), which provides in relevant part: "A judicial authority shall, upon motion of either party or upon its own motion, be disqualified from acting in a matter . . . because the judgment was reversed on appeal." In light of the procedural posture of this case and the factual determination to be made, it is necessary that the determination required on remand be made by the same trial judge. But see General Statutes § 51-183c.

record reveals a racial bias against the defendant. I write separately to emphasize that in cases involving claims of jury racial bias, as with claims of ordinary juror misconduct, our concern remains with the defendant's right to a fair trial.

It is well established that in cases of ordinary juror misconduct "[t]he question is whether . . . the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." (Internal quotation marks omitted.) *State* v. *Necaise*, 97 Conn. App. 214, 222, 904 A.2d 245, cert. denied, 280 Conn. 942, 912 A.2d 478 (2006). In *State* v. *Brown*, 235 Conn. 502, 526, 668 A.2d 1288 (1995) (en banc), our Supreme Court held that a trial court must conduct a preliminary inquiry on the record in any criminal case in which jury misconduct is alleged. The court left the form and scope of that inquiry to the trial court's discretion. In *State* v. *Santiago*, 245 Conn. 301, 336–40, 715 A.2d 1 (1998), the court expanded the inquiry that must be conducted in cases in which racial bias is alleged, reasoning that "[a]llegations of racial bias on the part of a juror are fundamentally different from other types of juror misconduct, because such conduct is, ipso facto, prejudicial." Id., 336. In a footnote following this sentence, the court explained: "We have recognized that not every incident of juror misconduct requires a new trial. . . . *The question is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial. . . .* The defendant has been prejudiced if the misbehavior is such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror." (Emphasis added; internal quotation marks omitted.) Id., 336 n.21. The court continued to explain that "[j]uror misconduct involving exposure to extrinsic material such as a dictionary . . . or a newspaper article or involving the

deliberation process such as a presubmission discussion among the jurors . . . simply [does] not pose the level of seriousness and likelihood of prejudice to the defendant as a juror who is racially biased." (Citations omitted.) Id. Therefore, according to *Santiago*, in cases in which jury racial bias is established, it is presumed that the defendant has been prejudiced and has not received a fair trial and, therefore, a new trial is automatically warranted.

In light of this precedent, I respectfully disagree with the majority opinion's statement in footnote 7 that "a trial court has the discretion to conclude that certain other manifestations of racial bias, such as racial bias toward another juror, would be ipso facto prejudicial to the defendant." In my view, this statement is too broad. Although a juror's racial bias toward another juror may be ipso facto prejudicial if the defendant's right to a fair trial is affected, the majority's statement could be interpreted to suggest that racial bias among the jury members is enough to warrant a new trial even in cases in which the jury's ability to deliberate fairly and impartially is not impeded. I recognize that there may be situations in which jury deliberations break down as a result of racial bias among jury members, thereby affecting the defendant's right to a fair trial, but this situation is not presented here.

I agree with the majority that the allegations in this case are more elusive than in *Santiago*, as the record does not contain racist statements directly referring to the defendant. I also agree with the majority's conclusion that racial bias demonstrated by one juror toward other jurors of the same race as the defendant could be indicative of that juror's racial bias against the defendant. I would, however, expand on the evidence in the record that is set forth by the majority. Specifically, I would refer to the testimony as to the juror's statement that he had predetermined the defendant's guilt on the

basis of his "demeanor." Because of the inherent ambiguity of this statement, which may have a racial connotation, this evidence should also be considered by the trial court in determining whether the juror harbored a racial bias against the defendant. Additionally, I would refer to the testimony of the other jury members that they believed the statements and conduct of the one juror to be racially motivated and to indicate his racial bias against the defendant.

The majority opinion limits the trial court in making its determination to whether a racial bias existed on the "objective facts" in the record and instructs the trial court to distinguish the jurors' testimony as to the statements and conduct of the one juror from their opinions as to the motivation underlying this behavior. The rule of practice and the cases cited by the majority for support address the well established policy against inquiring into a jury's deliberative process in determining a verdict. See Practice Book § 16-34; *Hamill* v. *Neikind*, 171 Conn. 357, 361, 370 A.2d 959 (1976); *Aillon* v. *State*, 168 Conn. 541, 550–52, 363 A.2d 49 (1975). Although I agree with the majority that the trial court improperly inquired into whether the one juror's statements and conduct influenced the verdict of the other jury members, I do not see how consideration by the trial court of the other jury members' assessments of this behavior would inappropriately touch on the reasoning behind their verdict. Indeed, our Supreme Court, in *Aillon* v. *State*, supra, 541, held that "jurors were competent to testify to the occurrence of incidents during trial or during their deliberations which might have affected the result of the trial, but could not testify as to the impact of such incidents on their verdict." *Hamill* v. *Neikind*, supra, 361. I disagree, therefore, that the trial court should be precluded from taking into account the testimony of the jury members as to their belief that the statements and conduct by the one juror reflected a

racial bias on his part against the defendant when such testimony did not reveal the effect of the statements and conduct on the verdict.

I qualify my statements by adding that the opinions of the other jury members that the one juror was racially biased would not alone be enough to warrant a mistrial. As previously stated by our Supreme Court, "[m]ere expression of opinion, as opposed to positive expression of facts, does not warrant a mistrial." (Internal quotation marks omitted.) *State* v. *Anderson*, 255 Conn. 425, 438, 773 A.2d 287 (2001). In the present case, the individual jury members concluded that the one juror was racially biased as a result of their interactions with him in the jury room. There was, therefore, a factual basis for their assertions of racial bias. As a result, the trial court should be permitted to consider, not only the statements and conduct in question but also the assessments of the jury members who observed first-hand what transpired in the jury room. This evidence is particularly important in this case, given the ambiguous nature of the allegations.

With respect to part II B, I do not agree with the majority's conclusion that the trial court properly allowed the state to impeach the defendant with evidence that he had used the youthful offender program. As the majority correctly notes, adjudication as a youthful offender is a determination of status rather than a conviction for the underlying offenses or charges. *State* v. *Eric T.*, 8 Conn. App. 607, 615, 513 A.2d 1273 (1986). As such, a youthful offender adjudication is inadmissible for impeachment purposes under General Statutes § 52-145 (b), which provides in relevant part that "*conviction of crime* may be shown for the purpose of affecting [a witness'] credibility." (Emphasis added.) See *State* v. *Keiser*, 196 Conn. 122, 128, 491 A.2d 382 (1985). The majority, however, concludes that the court properly allowed the state to question the defendant

on cross-examination as to whether he was familiar with the youthful offender procedure because he "opened the door" to that line of questioning by testifying on direct examination that the courtroom had been closed for a youthful offender proceeding and that he "didn't know what that really was about." I respectfully disagree.

First, given the protected nature of youthful offender proceedings, I do not believe that it was proper for the court to allow any inquiry into the defendant's prior experience with the youthful offender procedure. The youthful offender statutory scheme affords those eligible to be adjudged youthful offenders certain protections and benefits. For instance, all proceedings, except the motion for investigation of eligibility, are private. General Statutes § 54-76c. Statements, admissions or confessions made during youthful offender proceedings are inadmissible as evidence against the youth in subsequent proceedings except with respect to sentencing in certain situations. General Statutes § 54-76f. A youthful offender's records are confidential with the exception of certain permitted disclosures. General Statutes § 54-76*l*. Finally, a youthful offender's records are "automatically erased when such person attains twenty-one years of age, provided such person has not subsequent to being adjudged a youthful offender been convicted of a felony . . . prior to attaining such age. . . ." General Statutes § 54-76o. Section 54-76o further provides in relevant part that "[y]outhful offender status shall not be deemed conviction of a crime," and, "[n]o youth who has been the subject of an erasure order shall be deemed to have been arrested . . . ." General Statutes § 54-76o; see also *State* v. *Matos*, 240 Conn. 743, 750–52, 694 A.2d 775 (1997).

As our Supreme Court has determined, "[t]he youthful offender statutes were intended to protect and possibly rehabilitate those youths who had made a mistake

because of their immaturity." *State* v. *Matos*, supra, 240 Conn. 756. One important benefit of the youthful offender process is the avoidance of a record of a criminal conviction and the practical consequences that ensue from that record. In the present case, the court did not inquire into whether the defendant's records had been erased pursuant to the statute. The court, by allowing the state to question the defendant about his prior use of the youthful offender procedure, defeated the central purpose of this statutory scheme because the state was able to suggest to the jury that the defendant had a criminal history dating back to his youth.

Second, I disagree that the defendant invited or "opened the door" to the state's questioning concerning his prior involvement with the youthful offender program. Although, pursuant to the "opening the door" doctrine, "a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject"; (internal quotation marks omitted) *State* v. *Colon*, 272 Conn. 106, 186, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005); this doctrine does not allow for unrestricted cross-examination. "The doctrine of opening the door cannot . . . be subverted into a rule for injection of prejudice. . . . *The trial court must carefully consider whether the circumstances of the case warrant further inquiry into the subject matter, and should permit it only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence.* . . . Thus, in making its determination, the trial court should balance the harm to the state in restricting the inquiry with the prejudice suffered by the defendant in allowing the rebuttal." (Emphasis added; internal quotation marks omitted.) Id., 187.

The majority concludes that questioning by the state concerning the defendant's prior experience with the youthful offender program was necessary to rebut his testimony suggesting that he had learned of youthful offender procedures only from the marshal while waiting in court on his appointed court date. The majority reasons that the state's questioning established the defendant's independent knowledge of the program, thereby raising the possibility that his testimony about the closed courtroom came, not from being in court on the day in question, but from his prior personal experience. I respectfully disagree that the state's questioning was permissible for this purpose. The trial court allowed the state's questioning for the limited purpose of establishing the defendant's familiarity with the youthful offender program in order to impeach his statement that he did not know what was happening when the court was temporarily closed. Moreover, in my view, the majority unfairly imputes to the defendant knowledge of youthful offender procedures on the basis of his limited prior exposure in concluding as it does.

Applying the balancing test of the "opening the door" doctrine, I conclude that impeachment of the defendant's gratuitous statement that he did not understand what was happening when the courtroom was closed for a youthful offender proceeding was unwarranted. The essence of the defendant's defense was that he appeared in court on the appointed date but that he had missed the calling of his name. As discussed in the majority opinion, the defendant explained on direct examination that he left the courtroom for a short time and, when he attempted to reenter, the courtroom was closed for a youthful offender proceeding. He testified that he reentered the courtroom when the doors were opened but that court later adjourned without his name being called. He continued to testify as to his efforts to remedy the fact that he had missed the calling of his

name and stated that he thought he would be sent a bail commissioner's letter and given a new court date. The defendant's passing remark as to his lack of understanding of the youthful offender proceeding was incidental to his explanation as to how he missed the calling of his name; his defense did not turn on his understanding of why the courtroom had been closed or what a youthful offender proceeding involves. Rather, the question at hand was whether the courtroom was closed to the defendant and whether his later actions were enough to counter the state's proof that his failure to appear was wilful.

Moreover, the state had sufficient latitude in questioning to contradict the defendant's testimony and to establish that his failure to appear was wilful. On cross-examination, the state was able to establish the defendant's familiarity with court procedures and the consequences of failing to appear in court. Specifically, the state established that the defendant had appeared in court on prior occasions and that he knew he was required to appear when he had a scheduled court date. The state was also permitted to question the defendant about his prior convictions and pending charges for failure to appear. Through this questioning, the state elicited that the defendant had been arrested for failure to appear in the past and, on that occasion, did not receive a bail commissioner's letter.

Because the defendant's statement concerning his understanding of youthful offender procedure was not necessary to his defense and because there was sufficient evidence to support the failure to appear charge, I do not believe that the state would have been unfairly prejudiced had it been prevented from questioning the defendant as to his prior experience with the youthful offender procedure. I conclude that the court's decision to permit the questioning constituted an abuse of discretion.

Although I conclude that the court improperly allowed the state to question the defendant as to the youthful offender procedure, this error was harmless. It is well established that this court will not disturb a court's improper evidentiary ruling unless the defendant can demonstrate that he suffered harm as a result of that ruling. See, e.g., *State* v. *Sawyer*, 279 Conn. 331, 352, 904 A.2d 101 (2006). In the present case, the defendant answered, "no," when questioned by the state as to whether he was familiar with the youthful offender procedure and, "I don't recall," when asked whether he had utilized that procedure. The lack of an affirmative response by the defendant renders the court's allowance of this inquiry harmless.

For the foregoing reasons, I respectfully concur in the result.