Dunn *v.* Northeast Helicopters Flight Services, LLC

### TIM DUNN *v.* NORTHEAST HELICOPTERS FLIGHT SERVICES, LLC
### (SC 20626)

Robinson, C. J., and McDonald, D'Auria,
Mullins and Ecker, Js.

*Syllabus*

Pursuant to statute (§ 31-73 (b)), "[n]o employer . . . shall, directly or indirectly, demand, request, receive or exact any refund of wages, fee, sum of money or contribution from any person . . . upon the representation or the understanding that such refund of wages, fee, sum of money, contribution or deduction is necessary to secure employment or continue in employment."

The plaintiff sought to recover damages for the allegedly wrongful termination of his employment by the defendant, N Co., claiming that his termination was in violation of the public policy articulated in § 31-73 (b). N Co., which operates a helicopter flight training school, originally hired the plaintiff as a flight instructor and later promoted him to the role of chief pilot. The plaintiff was an at-will employee, and his claim was based on the cause of action recognized by this court in *Sheets* v. *Teddy's Frosted Foods, Inc.* (179 Conn. 471), for the discharge of an at-will employee when the employee can demonstrate a demonstrably improper reason for the discharge that is derived from the violation of public policy. The plaintiff, while employed at N Co., decided to pursue an opportunity to become a certified pilot examiner for the Federal Aviation Administration (FAA) after discussing the matter with B, N Co.'s owner. FAA examiners are sometimes affiliated with flight training schools, such as N Co., and charge fees in connection with conducting FAA examinations, which are paid directly by students seeking to secure pilot's licenses. B agreed that the plaintiff should pursue the opportunity and that having an FAA examiner affiliated with N Co. would benefit the company. The plaintiff later asked B for a loan to attend a required FAA training program. B responded that he would lend the plaintiff the money on the conditions that the plaintiff pay him back with the future examination fees the plaintiff would collect after becoming an FAA examiner and that, after the loan was paid back, the plaintiff pay N Co. 50 percent of the future examination fees he collected. The plaintiff did not respond to B's proposal or accept a loan from him. Subsequently, the plaintiff explained to R, an employee of N Co. and B's wife, that he chose to pay for the training expenses himself because he did not want to share the future examination fees and that he wanted to keep the FAA examiner position separate from his employment with N Co. R responded by stating that B said that the plaintiff no longer worked for

Dunn *v.* Northeast Helicopters Flight Services, LLC

N Co. The parties filed separate motions for summary judgment on the wrongful termination claim. The trial court denied the plaintiff's motion and granted N Co.'s motion, and the Appellate Court upheld the trial court's decision, concluding that § 31-73 (b) was inapplicable to the undisputed facts of this case because the share of future examination fees demanded by N Co. could not be attributed to the employment relationship but, rather, involved unrealized funds from a future business venture between the parties. In the alternative, the Appellate Court concluded that, even if § 31-73 (b) was applicable, the plaintiff failed to present sufficient evidence to support his assertion that N Co. violated § 31-73. On the granting of certification, the plaintiff appealed to this court.

*Held* that the Appellate Court incorrectly concluded that § 31-73 (b) was inapplicable and that the plaintiff failed to present sufficient evidence to support his wrongful termination claim:

1. This court concluded that the phrase "sum of money," as used in § 31-73 (b), encompasses any quantity or amount of currency, or a similar recognized measure of value, and is not limited to money derived from or directly related to the employment relationship, and that the share of examination fees demanded by B constituted a sum of money under the statute:

The term "sum of money" set forth in § 31-73 (b) was unambiguous insofar as neither the statute's plain language nor this court's previous interpretations of the statute have limited the form the sum of money must take, and the legislature's use of a series of terms, which ranged in specificity from "wages" to "sum of money," demonstrated that, if the legislature had wanted to narrow the application of the statute, it could have chosen a narrower term or omitted the broad term "sum of money" altogether.

Moreover, the statutory language did not include any requirement that the sum of money be derived from the employment relationship itself, the legislature was presumed to have used such broad language to prevent an employer from eliciting any form of payment from a prospective employee as a condition of employment or from an employee as a condition of continued employment, and the legislature's separation of the terms "sum of money" and "refund of wages" in § 31-73 (b) plainly manifested its intent to prohibit conduct in addition to that of a request or demand for wages.

2. This court concluded that the phrase "representation or . . . understanding," as used in § 31-73 (b), encompasses both expressed representations and mutual understandings, as well as implicit representations by and unilateral understandings of the employer, and that the representation or understanding need not be explicitly communicated to the employee, but, rather, the employer may have a unilateral understanding that the

Dunn *v.* Northeast Helicopters Flight Services, LLC

employee's acquiescence to the demand or request for a sum of money is necessary for continued employment:

As the legislature chose to use both the terms "representation" and "understanding" in § 31-73 (b), it indicated an intention for each term to encompass different forms of conduct.

In view of the common usage of the term "understanding" and the absence of any statutory language or legislative history to the contrary, this court declined to impose a requirement that the "understanding" contemplated by § 31-73 (b) be mutual and, instead, interpreted the statute to permit either a mutual understanding between the employer and the employee or prospective employee, or a unilateral understanding on the part of the employer, and this interpretation was consistent with the statute's purpose of protecting employees or prospective employees from employers who may seek to exploit the asymmetrical power dynamic inherent in the employer-employee relationship by conditioning employment or continued employment on financial demands or requests.

Moreover, by including the phrase "directly or indirectly" as a modifier to the terms "demand, request, receive or exact," the legislature signaled its intent to protect against not only explicit representations or mutual understandings, but also implicit representations or unilateral understandings that the employee's acquiescence to the demand or request for a sum of money is necessary to secure or continue employment.

Furthermore, the common usage of the term "representation" contemplates an act or statement made with the goal of inducing action, under this meaning of the term, a representation may be an implicit or indirect representation in the form of contemporaneous termination after an employee's refusal of the demand or request, so long as the employee can demonstrate a nexus between the two, and, contrary to the Appellate Court's conclusion, the representation need not be in the form of a threat or other explicit communication that the employee must agree to the demand or request, or face termination of employment, insofar as the language of § 31-73 (b) does not limit the representation to an explicit communication or threat, the definition of the term "representation" includes words or conduct, and such a limitation would render the term "indirectly" meaningless.

Contrary to N Co.'s claim that this court's interpretation of § 31-73 (b) imparts a broader public policy mandate than that reflected in the statute, a result that N Co. argued was prohibited by prior decisions of this court, the line of cases on which N Co. relied was distinguishable because those cases dealt with explicit statutory limitations to the public policy implemented by the legislature, which this court refused to disregard, whereas § 31-73 (b) contains no such limitation.

346 Conn. 360        MARCH, 2023        363

Dunn *v.* Northeast Helicopters Flight Services, LLC

3. The Appellate Court incorrectly concluded that the plaintiff could not prevail on his wrongful termination claim as a matter of law, as the record contained sufficient facts on which a reasonable jury could find that there was a "representation or . . . understanding" that the plaintiff was required to accept B's demand for a share of the plaintiff's future examination fees in order to continue his employment with N Co.:

There was evidence from which a jury could conclude that there was either a unilateral understanding on the part of N Co. that, if the plaintiff did not agree to give N Co. 50 percent of his future examination fees, his employment would be terminated, or that the termination of the plaintiff's employment was a representation by N Co. that the plaintiff's acceptance of the demand for 50 percent of the examination fees was necessary to continue his employment.

Specifically, the record demonstrated that the plaintiff believed that the termination of his employment was due to his refusal to agree to pay N Co. 50 percent of the fees and that B stated that the plaintiff's refusal was the "last straw" that resulted in the termination of his employment, and the record also demonstrated that the plaintiff was discharged immediately after he noted to R that he did not want to share the examination fees with N Co.

Because material questions of fact remained, summary judgment was inappropriate, and, accordingly, this court reversed the Appellate Court's judgment and remanded the case with direction to reverse the trial court's judgment and for further proceedings.

(*Two justices dissenting in one opinion*)

Argued September 12, 2022—officially released March 21, 2023

*Procedural History*

Action to recover damages for the allegedly wrongful discharge of the plaintiff, and for other relief, brought to the Superior Court in the judicial district of Tolland, where the court, *Farley, J.*, granted the defendant's motion for summary judgment as to the first count of the complaint and denied the plaintiff's motion for summary judgment; thereafter, the plaintiff withdrew the second count of the complaint, and the court, *Farley, J.*, rendered judgment for the defendant, from which the plaintiff appealed to the Appellate Court, *Prescott, Moll* and *Alexander, Js.*, which affirmed the trial court's judgment, and the plaintiff, on the granting

Dunn *v.* Northeast Helicopters Flight Services, LLC

of certification, appealed to this court. *Reversed*; *further proceedings*.

*Michael Reilly*, with whom, on the brief, was *Megan L. Michaud*, for the appellant (plaintiff).

*Michael C. Harrington*, for the appellee (defendant).

*Opinion*

McDONALD, J. In this appeal, we must consider the scope of the public policy embodied in General Statutes § 31-73 (b) in the context of a common-law wrongful discharge claim brought pursuant to the principles set forth in *Sheets* v. *Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 474–77, 427 A.2d 385 (1980). In *Sheets*, this court recognized a new cause of action for the discharge of an at-will employee if the employee can prove a "demonstrably improper reason for dismissal . . . derived from some important violation of public policy." (Emphasis omitted.) Id., 475. The plaintiff in this case, Tim Dunn, claims that he was wrongfully discharged when the defendant, Northeast Helicopters Flight Services, LLC, terminated his employment after he refused to share fees that he expected to receive as a Federal Aviation Administration (FAA) certified pilot examiner, in violation of the public policy embodied in § 31-73 (b), which prohibits an employer from demanding or requesting a sum of money upon the representation or understanding that acceptance of the demand or request is necessary for continued employment. In that regard, we must determine the meaning of the phrases "sum of money" and "representation or . . . understanding," as used in § 31-73 (b). We conclude that the Appellate Court improperly upheld the trial court's decision to render summary judgment for the defendant on the present record because (1) the statutory term "sum of money" is broad and encompasses any form of money or funds, regardless of whether it is directly related to the employment relationship, (2) the phrase "represen-

Dunn *v.* Northeast Helicopters Flight Services, LLC

tation or . . . understanding,'' as used in the statute, encompasses both unilateral and bilateral understandings, as well as implicit and explicit representations, that an employee's continued employment is conditioned on the employee's acceptance of an employer's demand of a sum of money, and (3) the question of whether a ''representation or . . . understanding'' existed in this case is one for a fact finder and is not an appropriate determination for summary judgment because material issues of fact remain.

The following facts and procedural history are relevant to our resolution of this appeal. The defendant is a helicopter flight training school that trains individuals to become helicopter pilots. In 2006, the defendant hired the plaintiff as a flight instructor to be paid a salary and additional hourly wages for time spent flying with students in the defendant's program. The defendant ultimately promoted the plaintiff to the role of chief pilot—a position he held for approximately eleven years. The parties do not dispute that the plaintiff did not have an employment contract with the defendant and was an at-will employee.

In order for a student to secure a pilot's license, the student must pass a flying examination conducted by an FAA examiner, who may charge a fee for the examination. As a result, once a student completes training, the flight instructor arranges for the student to be tested by an FAA examiner. Some FAA examiners are affiliated with a flight school, whereas others, who are not, perform examinations throughout a particular region. When performing examinations, FAA examiners affiliated with a flight school are not employees of the school but, rather, are agents of the FAA and charge a fee paid directly by the student to the FAA examiner. The student, separate from the examination fee, directly pays the flight school to rent a helicopter during the examination.

Dunn *v.* Northeast Helicopters Flight Services, LLC

The plaintiff and the defendant's owner, John Boulette (Boulette), discussed the plaintiff's desire to become an FAA examiner and the benefits to the defendant of having such an examiner on its staff. At the time of those discussions, the nearest FAA examiner was located more than two hours away from the defendant's facilities, and students often had to wait weeks to schedule an examination. In 2017, the FAA notified the plaintiff that an FAA examiner position was available in the region. The plaintiff notified Boulette, who agreed that the plaintiff should seek out the opportunity. Boulette and the plaintiff agreed that having an FAA examiner affiliated with the defendant would make the flight school more attractive to students because the examiner would be able to offer independent examination services to any eligible students in the region, including students of the defendant.

To obtain his FAA examiner certification, the plaintiff was required to attend training in Oklahoma City, Oklahoma. In August, 2017, the plaintiff approached Boulette and asked for a loan to attend the training. Boulette informed the plaintiff that he would lend him the money to cover the training but that he wanted the plaintiff to pay him back with the future examination fees the plaintiff would collect after becoming an FAA examiner. Boulette further stated that, after the loan for the training fees was paid back, he wanted 50 percent of the future examination fees that the plaintiff collected.[1] The plaintiff left Boulette's office without saying anything in response to the request, which Boulette claims he understood as an indication of the plaintiff's agreement. This was the only conversation Boulette and the plain-

_____

[1] The parties dispute whether Boulette requested 50 percent of all examination fees or just those fees from examinations of the defendant's students. Viewed in the light most favorable to the plaintiff as the nonmoving party, we treat the facts as a demand that the plaintiff pay 50 percent of all future fees.

Dunn *v.* Northeast Helicopters Flight Services, LLC

tiff had regarding this arrangement. According to Boulette, he assumed that the defendant would pay for the training in Oklahoma because the plaintiff would be representing the defendant as an examiner on staff. The plaintiff claims that, shortly after this conversation, he spoke with Rhonda Boulette, an employee of the defendant and the wife of Boulette, and he indicated to her that he was not inclined to agree to the arrangement, to which she responded: "[T]hat is fine. Don't worry about it."

Following the plaintiff's return from training, Rhonda Boulette contacted the plaintiff by text message to ask why he did not charge any of the training expenses to the defendant's credit card. The plaintiff responded that he chose to pay for the expenses himself because he did not want to pay the defendant 50 percent of the future examination fees he received, and he wanted to keep the FAA examiner position separate from his employment with the defendant. Rhonda Boulette responded via text message to the plaintiff, stating: "[Boulette] said clean out your desk you do not work for [the defendant] anymore." The plaintiff responded, "[w]ill do."

In November, 2017, the plaintiff commenced the underlying action against the defendant, asserting, among other things, a claim of wrongful discharge under the judicial exception to the at-will employment doctrine first established in *Sheets* v. *Teddy's Frosted Foods, Inc.*, supra, 179 Conn. 474–77.[2] In his complaint, the plaintiff alleged that the termination of his employment was unlawful because the defendant had demanded that he pay the defendant a sum of money—50 percent of any future proceeds resulting from his independent

[2] The complaint also included a claim of failure to pay wages pursuant to General Statutes §§ 31-58 et seq., 31-71a et seq. and 31-71e et seq. That claim was subsequently resolved by the parties and withdrawn, and it is not at issue in this appeal.

Dunn *v.* Northeast Helicopters Flight Services, LLC

examination business on behalf of the FAA—as a requirement for his continued employment with the defendant, all in violation of public policy, as articulated in § 31-73 (b).

Following discovery, the plaintiff moved for summary judgment on his wrongful discharge claim. In response, the defendant also filed a motion for summary judgment. In his memorandum in support of his motion for summary judgment, the plaintiff argued that the defendant admitted that his refusal to pay the fees was a motivating factor for the termination, and that, although the defendant did not explicitly tell him that paying 50 percent of the fees was a condition of continued employment, the only logical inference, based on the immediate termination of his employment after his refusal to agree with Boulette's demand, was that the payment was, indeed, a condition of continued employment. The defendant countered that § 31-73 must be strictly construed and that no violation occurred because there was no evidence of any mutual "representation or . . . understanding" that employment was contingent on the fee sharing demand, and that a violation of the statute cannot be inferred. After hearing oral argument on the motions, the trial court issued a memorandum of decision, granting the defendant's motion and denying the plaintiff's motion. The trial court concluded that the facts, construed favorably to the plaintiff, did not establish a violation of § 31-73, and, therefore, the plaintiff was unable to pursue a common-law wrongful discharge claim under the *Sheets* doctrine.

Thereafter, the plaintiff filed an appeal with the Appellate Court, which upheld the decision of the trial court. See *Dunn* v. *Northeast Helicopters Flight Services, LLC*, 206 Conn. App. 412, 416, 437, 261 A.3d 15 (2021). The Appellate Court concluded that § 31-73 was inapplicable to the undisputed facts of this case because the 50 percent of the future fees demanded by the defen-

Dunn *v.* Northeast Helicopters Flight Services, LLC

dant could not be attributed to the employment relationship but, rather, involved unrealized funds from a future business venture between the parties. See id., 433. Additionally, it concluded that § 31-73 (b) does not regulate an employer's reason for discharging an employee but, instead, prohibits the use of continued employment as leverage to extort a sum of money. Id., 434. The Appellate Court thus concluded that § 31-73 (b) could not, as a matter of law, provide the basis for a wrongful discharge action. Id., 434–35. The Appellate Court further concluded that, even if it deemed § 31-73 (b) applicable, it agreed with the trial court that the plaintiff "failed to present evidence to support his assertion that the defendant actually violated § 31-73 and, thus, the public policy underlying the statute." Id., 432.

The plaintiff filed a petition for certification to appeal, which we granted, limited to the following issues: (1) "Did the Appellate Court correctly conclude that the public policy contained in . . . § 31-73 (b) is inapplicable to the facts of this case and, as a matter of law, cannot form the basis for a common-law wrongful [discharge] action?" And (2) "[d]id the Appellate Court correctly conclude, in the alternative, that the evidence presented at the summary judgment stage failed to support the plaintiff's claim that the defendant actually violated the public policy contained in § 31-73 (b)?" *Dunn* v. *Northeast Helicopters Flight Services, LLC*, 338 Conn. 915, 915–16, 259 A.3d 1180 (2021). We answer both questions in the negative.

We begin by setting forth the relevant legal principles governing our review of the issues on appeal. "The standard of review of a trial court's decision [to grant a motion for] summary judgment is well established. Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving

Dunn *v.* Northeast Helicopters Flight Services, LLC

party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . Our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary. . . . On appeal, we must determine whether the legal conclusions reached by the trial court are legally and logically correct and whether they find support in the facts set out in the memorandum of decision of the trial court.'' (Citations omitted; internal quotation marks omitted.) *Lucenti* v. *Laviero*, 327 Conn. 764, 772–73, 176 A.3d 1 (2018).

We next turn to the applicable law governing the public policy exception to the at-will employment doctrine. "In Connecticut, an employer and employee have an at-will employment relationship in the absence of a contract to the contrary.'' (Internal quotation marks omitted.) *Thibodeau* v. *Design Group One Architects, LLC*, 260 Conn. 691, 697, 802 A.2d 731 (2002). "Employment at will grants both parties the right to terminate the relationship for any reason, or no reason, at any time without fear of legal liability.'' (Internal quotation marks omitted.) Id., 697–98. As an exception to the general rule allowing at-will employees to be discharged at any time, for any reason, this court, in *Sheets* v. *Teddy's Frosted Foods, Inc.*, supra, 179 Conn. 475, "sanctioned a common-law cause of action for wrongful discharge in situations in which the reason for the discharge involved impropriety derived from some important violation of public policy.'' (Internal quotation marks omitted.) *Thibodeau* v. *Design Group One Architects, LLC*, supra, 698; see also, e.g., *Morris* v. *Hartford Courant Co.*, 200 Conn. 676, 679, 513 A.2d 66 (1986).

"The question of whether a challenged discharge violates public policy . . . is a question of law to be decided by the court . . . .'' *Faulkner* v. *United Technologies Corp.*, 240 Conn. 576, 588, 693 A.2d 293 (1997).

Dunn *v.* Northeast Helicopters Flight Services, LLC

In order to overcome the "inherent vagueness of the concept of public policy and the difficulty encountered when attempting to define precisely the contours of the public policy exception . . . [w]e look to see whether the plaintiff has . . . alleged that his discharge violated any explicit statutory or constitutional provision . . . or whether he alleged that his dismissal contravened any judicially conceived notion of public policy." (Internal quotation marks omitted.) Id., 581.

On several occasions since *Sheets*, we have had to consider the boundaries of the public policy exception. "[W]e repeatedly have underscored our adherence to the principle that the public policy exception to the general rule allowing unfettered termination of an at-will employment relationship is a narrow one . . . . Consequently, we have rejected claims of wrongful discharge that have not been predicated [on] an employer's violation of an important and clearly articulated public policy." (Citations omitted; internal quotation marks omitted.) *Thibodeau* v. *Design Group One Architects, LLC*, supra, 260 Conn. 701. When a plaintiff relies on a statutory provision articulating the public policy, we are careful not to read a broader public policy mandate than that represented in the statute. See, e.g., *Daley* v. *Aetna Life & Casualty Co.*, 249 Conn. 766, 804, 734 A.2d 112 (1999) ("In declining to recognize an important public policy to that effect, we are mindful that we should not ignore the statement of public policy that is represented by a relevant statute. . . . Nor should we impute a statement of public policy beyond that which is represented. To do so would subject the employer who maintains compliance with express statutory obligations to unwarranted litigation for failure to comply with a heretofore unrecognized public policy mandate." (Citation omitted.)). We have declined to recognize exceptions under the *Sheets* doctrine when a plaintiff fails to create a material issue of fact as to

whether a defendant's conduct violated the statutory provision on which the plaintiff relied to demonstrate the important public policy. See, e.g., *Burnham* v. *Karl & Gelb, P.C.*, 252 Conn. 153, 170, 745 A.2d 178 (2000) (holding that plaintiff failed to state claim because allegations of retaliatory discharge did not satisfy requirements of statute on which claim was based).

Here, the plaintiff claims that the defendant wrongfully terminated his employment in violation of the public policy embodied in § 31-73 (b). In considering whether the plaintiff's claim may survive summary judgment, we must construe § 31-73 (b) to determine what important public policy it embodies and whether there exists a genuine issue of material fact as to whether the defendant's conduct violated the statute. The interpretation of § 31-73 (b) and our review of the trial court's judgment for the defendant both involve questions of law over which our review is plenary. See, e.g., *Peek* v. *Manchester Memorial Hospital*, 342 Conn. 103, 110, 269 A.3d 24 (2022); *Day* v. *Seblatnigg*, 341 Conn. 815, 826, 268 A.3d 595 (2022). Accordingly, we review § 31-73 (b) in accordance with our familiar principles of statutory interpretation. See, e.g., *Sena* v. *American Medical Response of Connecticut, Inc.*, 333 Conn. 30, 45–46, 213 A.3d 1110 (2019).

Section 31-73 (b) provides in relevant part: "No employer, contractor, subcontractor, foreman, superintendent or supervisor of labor, acting by himself or by his agent, shall, directly or indirectly, demand, request, receive or exact any refund of wages, fee, sum of money or contribution from any person, or deduct any part of the wages agreed to be paid, upon the representation or the understanding that such refund of wages, fee, sum of money, contribution or deduction is necessary to secure employment or continue in employment. No such person shall require, request or demand that any person agree to make payment of any refund of wages,

Dunn *v.* Northeast Helicopters Flight Services, LLC

fee, contribution or deduction from wages in order to obtain employment or continue in employment. . . .''

Section 31-73 (b) is remedial in nature. See, e.g., *Mytych* v. *May Dept. Stores Co.*, 260 Conn. 152, 160, 793 A.2d 1068 (2002). In interpreting such a statute, ''any ambiguities should be resolved in a manner that furthers, rather than thwarts, the [statute's] remedial purposes.'' (Internal quotation marks omitted.) *Finkle* v. *Carroll*, 315 Conn. 821, 831, 110 A.3d 387 (2015). We have previously stated that the language in § 31-73 (b) prohibits an employer from demanding or requesting ''any . . . sum of money or contribution from any person . . . upon the representation or the understanding that such . . . sum of money . . . is necessary to secure employment or continue in employment.'' (Internal quotation marks omitted.) *Mytych* v. *May Dept. Stores Co.*, supra, 166. In other words, § 31-73 (b) prevents an employer from, ''directly or indirectly'' demanding or requesting any ''sum of money'' from an employee or prospective employee upon the ''representation or . . . understanding'' that the employee or prospective employee must comply with the demand or request to continue or secure employment. We note, at the outset of our analysis, the legislature's express inclusion of the phrase ''*directly or indirectly*'' as a modifier to the terms ''demand, request, receive or exact . . . .'' (Emphasis added.) General Statutes § 31-73 (b). This phrase informs our analysis of the remainder of the statute, insofar as it evidences the legislature's contemplation of both explicit communications—such as overt threats or demands—as well as interactions of a more tacit or unspoken nature—such as insinuated or implicit demands or requests. Cf. *State* v. *Phillips*, 102 Conn. App. 716, 722, 927 A.2d 931 (giving example of indirectly threatening language), cert. denied, 284 Conn. 923, 933 A.2d 727 (2007). In order to determine the full scope of the statute, we must consider this expansive

language alongside the meaning of the phrases "sum of money" and "representation or . . . understanding . . . ."

Beginning with the term "sum of money," we note that, in the absence of a statutory definition, General Statutes § 1-1 (a) directs us to look to the common meaning of the words used in the statute. See, e.g., *Stone-Krete Construction, Inc.* v. *Eder*, 280 Conn. 672, 677–78, 911 A.2d 300 (2006). The term "sum" is defined in relevant part as an "[a]mount produced by adding two or more numbers, magnitudes, quantities, together; the total . . . [a] quantity, or amount, of money . . . ." The Universal Dictionary of the English Language (1932) p. 1214. The term "money" is defined in relevant part as "[g]old, silver, or other metal coined under [s]tate authority to serve as currency; coin or coins in general . . . [s]ums of money . . . [a]ny recognized medium of exchange and measure of value . . . [w]ealth, property, one's fortune generally . . . ." Id., p. 741.

On the basis of the common usage of the terms, we conclude that the plain language of the phrase "sum of money" is unambiguous and encompasses any quantity or amount of currency or a similar recognized measure of value. The language of § 31-73 (b) does not limit the form in which the "sum of money" must be or include any requirement that the sum of money be directly related to the employment relationship. Indeed, the statute was written in "broad and sweeping language"; *Lockwood* v. *Professional Wheelchair Transportation, Inc.*, 37 Conn. App. 85, 94–95, 654 A.2d 1252, cert. denied, 233 Conn. 902, 657 A.2d 641 (1995); in furtherance of its remedial purpose "to prevent the employer from taking advantage of the legal agreement that exists between the employer and the employee." *Mytych* v. *May Dept. Stores Co.*, supra, 260 Conn. 160–61. In *Lockwood*, the Appellate Court determined that "[§] 31-73

Dunn *v.* Northeast Helicopters Flight Services, LLC

represents a clear public policy prohibiting an employer from taking advantage of the employment relationship *by using the acquisition or continuation of employment as a mechanism for exacting sums of money from an employee.*" (Emphasis added.) *Lockwood* v. *Professional Wheelchair Transportation, Inc.*, supra, 94. In neither the statute's plain language nor our previous interpretations of the statute have we limited the scope of what "sum of money" may refer to, and we see no reason to do so on this factual record.

The legislature chose a series of terms ranging in specificity from "wages" to "sum of money . . . ." General Statutes § 31-73 (b). "Sum of money" is a broad term. If the legislature wanted to narrow the application of the statute, it could have chosen a narrower term, or omitted the broad term "sum of money" altogether, as it did in the second sentence of subsection (b). See General Statutes § 31-73 (b) ("[n]o such person shall require, request or demand that any person agree to make payment of any refund of *wages, fee, contribution or deduction from wages* in order to obtain employment or continue in employment" (emphasis added)). Therefore, we conclude that a "sum of money," as used in the statute, may include earnings or other money, whether the source is related or unrelated to the employment relationship at issue.

Notwithstanding the use of broad terms in the statute to include payments or extractions other than wages, the Appellate Court concluded, and the defendant argues, that § 31-73 (b) does not apply to private business dealings between parties, even when an employment relationship exists. See *Dunn* v. *Northeast Helicopters Flight Services, LLC*, supra, 206 Conn. App. 432–34. The Appellate Court concluded that, because the funds at issue related to the plaintiff's FAA examiner position, the money could not be reasonably attributed to the existing employment relationship between the

parties but, rather, to a separate, future business venture between the parties. Id., 433. As a result, the court concluded that § 31-73 (b) was inapplicable. Id., 434–35. We find this reasoning unpersuasive.

The language of § 31-73 (b) simply does not include any requirement that the "sum of money" be derived from the employment relationship itself. We presume that the legislature intentionally chose broad language, such as "sum of money," to prevent an employer from eliciting *any* form of payment from a prospective employee or employee as a condition of employment or the continuation of employment. See, e.g., *King* v. *Volvo Excavators AB*, 333 Conn. 283, 296, 215 A.3d 149 (2019) ("when the legislature chooses to act, it is presumed to know how to draft legislation consistent with its intent" (internal quotation marks omitted)).

The term "sum of money" is separated from the term "refund of wages," a drafting choice that plainly manifests an intention to prohibit conduct in addition to that of a request or demand for wages. Construing § 31-73 (b) to require that the funds be related to employment would fail to protect employees in many other instances in which an employer uses the power imbalance inherent in the employment relationship to exact sums of money from an employee. For example, such a narrow construction would not protect an employee from an employer's demand or request that the employee pay the employer one half of his income from a different, weekend job, or one half of the proceeds from a private sale of his personal automobile. Certainly, the same concerns that underlie an employer's demand or request that an employee turn over his wages would exist in these examples. In short, the statute is aimed at preventing an employer from exercising authority over an employee to require that employee to turn over funds that belong to the employee, regardless of how those funds are obtained by the employee.

Dunn *v.* Northeast Helicopters Flight Services, LLC

Having concluded that the term "sum of money" is not limited to money derived from the employment, and because there is no issue of fact remaining as to whether the examiner fees meet this definition, we conclude, as a matter of law, that the share of examiner fees demanded by Boulette constitutes a "sum of money" under the statute.

We next examine the meaning of the phrase "representation or . . . understanding," as used in § 31-73 (b), which requires a plaintiff to prove that the demand or request is made "upon the representation or the understanding that such . . . sum of money . . . is necessary to secure employment or continue in employment." In the absence of statutory definitions, we again look to the common usage of each term. "Understanding" is defined as an "[a]ct of one who understands: mental grasp, comprehension, knowledge: discernment . . . [i]ntelligence; power, faculty, of comprehension or thought; sense . . . [a]greement, unity of thought, feeling . . . that which is mutually agreed [on] or understood . . . ." The Universal Dictionary of the English Language, supra, p. 1317. Black's Law Dictionary contains a similar definition of the term: "The quality, state, or process of comprehending; the mental state of a person who understands something . . . [o]ne's personal interpretation of an event or occurrence . . . [a]n agreement, [especially] of an implied or tacit nature." Black's Law Dictionary (11th Ed. 2019) p. 1837. "Representation" is defined as the "[a]ct of representing . . . [a] statement, assertion . . . ." The Universal Dictionary of the English Language, supra, p. 1000. Black's Law Dictionary defines the term as "[a] presentation of fact—either by words or by conduct—made to induce someone to act . . . ." Black's Law Dictionary, supra, p. 1556.

The defendant contends that the statutory language requires a mutual or bilateral understanding shared by

Dunn *v.* Northeast Helicopters Flight Services, LLC

the parties and argues that it is entitled to summary judgment because no reasonable person could conclude that there was an explicit representation or mutual understanding about the consequences that would result from the plaintiff's failure to share the fees, a subject that was never discussed by the parties prior to the employment termination. The Appellate Court likewise determined that "no evidence was submitted . . . that tended to demonstrate that the parties ever reached any mutual 'understanding' that the plaintiff's agreement to the fee sharing arrangement was a condition of his continued employment." *Dunn* v. *Northeast Helicopters Flight Services, LLC*, supra, 206 Conn. App. 436. The plaintiff contends that § 31-73 (b) was written to have a broader scope and that it does not contain any language requiring that the understanding be mutual before the adverse consequences of noncompliance become manifest or that there must be a threat accompanying the demand or request. We construe the statute to be ambiguous in this regard.[3] See, e.g., *Gonzalez* v. *O & G Industries, Inc.*, 322 Conn. 291, 303, 140 A.3d 950 (2016) ("[t]he test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation" (internal quotation marks omitted)).

---

[3] Although we determined in *Mytych* that § 31-73 (b) was plain and unambiguous in the context of determining its overall purpose; see *Mytych* v. *May Dept. Stores Co.*, supra, 260 Conn. 166; we now look to the text of the statute to consider whether the specific phrase "representation or . . . understanding" is plain and unambiguous. Put differently, although we have previously concluded that § 31-73 (b) was plain and unambiguous generally, this case calls on us to address a more specific issue, namely, what is required to satisfy a particular aspect of the statute. Our previous determination that the general purpose of the statute was plain and unambiguous is not dispositive of the issue of whether the phrase "representation or . . . understanding" is ambiguous. Cf. *State* v. *Tabone*, 279 Conn. 527, 538, 902 A.2d 1058 (2006) (concluding that one sentence of statute was plain and unambiguous, but another sentence of same statute was ambiguous in relevant context).

346 Conn. 360 MARCH, 2023 379

Dunn *v.* Northeast Helicopters Flight Services, LLC

To properly ascertain the meaning of the text of § 31-73 (b), we begin by observing that the legislature chose to use both the terms "representation" and "understanding" in its crafting of the statute. Its use of both terms indicates an intention for each to apply in separate instances—to encompass different forms of conduct. The common usage of "understanding" includes both a bilateral understanding; see The Universal Dictionary of the English Language, supra, p. 1317 ("*mutually* agreed [on] or understood" (emphasis added)); and a unilateral understanding. See id. ("understanding" includes "[a]ct of *one*" (emphasis added)). Therefore, we must determine whether § 31-73 (b) requires a mutual prior understanding between the employer and the employee that the employee's acquiescence to the demand or request of the sum of money was necessary to secure or continue employment. There is no legislative history to illuminate further whether the legislature intended a bilateral or unilateral understanding.[4]

In the absence of any legislative guidance to the contrary, we conclude that the proper interpretation of the statute is one which permits *either* a mutual understanding between the employer and the employee *or* a unilateral understanding on the part of the employer. We agree with the plaintiff that § 31-73 (b) does not contain any language requiring that the understanding be mutual, and we decline to impose such a limitation when the legislature has not so restricted it.

There is nothing contradictory or inconsistent between the two constructions. Indeed, the asymmetrical power dynamic inherent in the typical employer-employee relationship weighs strongly in favor of affording greater

---

[4] The statute has remained largely untouched since its 1939 enactment. See General Statutes (Supp. 1939) § 1321e. Although the legislation was referred to the Judiciary Committee during the January, 1939 session, there is no record of the committee hearings from that year, and therefore no record of any discussion of this legislation.

Dunn *v.* Northeast Helicopters Flight Services, LLC

protections to employees in order to effectuate the remedial purpose of the statute. See, e.g., *Brown* v. *Soh*, 280 Conn. 494, 506 n.7, 909 A.2d 43 (2006) (noting disparity in bargaining power in employment contract negotiations and "economic necessity [that] forces the employee to accept the employer's terms" (internal quotation marks omitted)); *Salehpoor* v. *New Mexico Institute of Mining & Technology*, 447 P.3d 1169, 1173 n.3 (N.M. App. 2019) (noting "imbalance of power inherent in the employer-employee relationship" (internal quotation marks omitted)). Due to this power imbalance, employees implicitly understand that they must do as instructed by their employers or risk the termination of their employment. Section 31-73 (b) seeks to protect employees from employers who may seek to exploit this power dynamic by making financial demands or requests and conditioning employment on such demands or requests.

A narrower interpretation that requires a mutual understanding between an employer and employee would enable an employer to demand or request money from an employee, and discharge an employee who refused, so long as the employer did not explicitly inform the employee beforehand that he would be discharged for his refusal. If the legislature wanted to protect only communicated threats or explicit understandings, it would not have included language expressly prohibiting the employer from "directly or indirectly" making such demands or requests. The legislature signaled its intent to protect against not only explicit representations or mutual understandings but also implicit representations or unilateral understandings that the employee's acquiescence to the demand or request for a sum of money was necessary to continue employment.

We next consider the term "representation." The common usage of the term contemplates that a "representation" is an act or statement made with the goal of

Dunn *v.* Northeast Helicopters Flight Services, LLC

inducing action. We agree with the plaintiff that, under this meaning of the term, a "representation" may indeed be an implicit or indirect representation in the form of contemporaneous termination after an employee's refusal of the demand or request, so long as the employee can demonstrate a nexus between the two. The contemporaneous action of termination after the rejection of the demand or request may signal that the employee's acceptance was necessary to continue employment. By terminating the employee's employment, the employer may seek to induce the employee's acquiescence to the demand or request in order to have his employment reinstated.

We disagree with the Appellate Court's conclusion that the representation must be in the form of a threat or other explicit communication that the employee agree to the demand or request or face the termination of his employment. See *Dunn* v. *Northeast Helicopters Flight Services, LLC*, supra, 206 Conn. App. 436. The language of § 31-73 (b) does not limit the "representation" to an explicit communication or threat. Rather, the definition of the term contemplates that a "representation" may include words *or conduct*, indicating the potential for a representation by action. If we are to accept the Appellate Court's requirement that the representation be explicit, we are left with the incongruous result of allowing an employer to engage in conduct that it is prohibited from threatening, a counterintuitive meaning that we will not attribute to the legislature in the absence of clear evidence that such a result was intended. It bears emphasizing again that the statute prohibits the employer from "*directly or indirectly*" demanding, requesting, receiving, or exacting a sum of money from the employee. (Emphasis added.) General Statutes § 31-73 (b). If the legislature wanted to prohibit only explicit threats, it could have omitted the term "indirectly" when crafting the statute. It is incongruous

to couple an indirect demand or request with a mutual understanding or explicit representation. Construing the phrase "representation or . . . understanding" to require that a threat or other explicit representation be communicated to the employee would render the term "indirectly" meaningless. See, e.g., *State* v. *Reynolds*, 264 Conn. 1, 135, 836 A.2d 224 (2003) ("[w]e ordinarily do not read statutes so as to render parts of them superfluous or meaningless" (internal quotation marks omitted)), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

In sum, we conclude that the phrase "representation or . . . understanding" encompasses both expressed representations and mutual understandings, as well as implicit representations by and unilateral understandings of the employer. We also conclude that the representation or understanding need not be explicitly communicated to the employee, but, rather, under the language of the statute, the employer may have a unilateral understanding that the employee's acquiescence to the demand or request for a sum of money is necessary to continue employment. If the employer has such an understanding and acts on that understanding by discharging the employee for his refusal, that conduct is in violation of the statute, regardless of whether the understanding was communicated to the employee. The definitions of the terms "understanding" and "representation" themselves contemplate agreements of an "implied or tacit nature," as well as representations by conduct *or* words, indicating that such a "representation or . . . understanding" need not be mutual or communicated between the parties. See Black's Law Dictionary, supra, pp. 1556, 1837. Such unilateral understandings or implicit representations may be evidenced when, as here, an employee was discharged immediately after, and allegedly in connection with, his refusal to comply with a demand or request for a sum of money.

Dunn *v.* Northeast Helicopters Flight Services, LLC

The defendant contends that our interpretation of § 31-73 (b) imparts a broader public policy mandate than that reflected in the statute—a result prohibited by *Burnham* v. *Karl & Gelb, P.C.*, supra, 252 Conn. 153, and its progeny. The *Burnham* line of cases, however, dealt with explicit limitations to the public policy implemented by the legislature, which this court refused to disregard. Section 31-73 (b) contains no such limitation.

In *Burnham*, the plaintiff made a claim of retaliatory discharge in violation of the public policy embodied in General Statutes (Rev. to 1993) § 31-51m (b), which prevented "employers from retaliating against employees who report a violation or a suspected violation of any state or federal law . . . to a public body . . . ." (Emphasis omitted; internal quotation marks omitted.) Id., 160. General Statutes (Rev. to 1993) § 31-51m (a) (4) contained a limited definition of "public body" as any "public agency," as defined in General Statutes (Rev. to 1993) § 1-18a (a). (Internal quotation marks omitted.) Id. The plaintiff in *Burnham* reported an alleged violation of the federal Occupational Safety and Health Act of 1970 to the Connecticut State Dental Association. Id., 155. This court concluded that the plaintiff failed to argue or present any evidence that the dental association was a public body under the limited definition in the statute. See id., 161. Because we concluded that the plaintiff failed to establish a material issue of fact as to whether the defendant violated the public policy embodied in the statute, we held that the plaintiff could not use that public policy to support her claim of wrongful discharge. See id.

We reached a similar conclusion in *Thibodeau* v. *Design Group One Architects, LLC*, supra, 260 Conn. 691, when the plaintiff asserted a common-law claim of wrongful discharge in violation of the public policy against sex discrimination embodied in General Statutes § 46a-60 (a) (7). See id., 693–95. Years prior, the

Dunn *v.* Northeast Helicopters Flight Services, LLC

legislature had amended an early version of the act pertaining to fair employment practices to limit its application to employers with three or more employees. See Public Acts 1967, No. 253, codified at General Statutes (Cum. Supp. 1967) § 31-122 (f); see also *Thibodeau* v. *Design Group One Architects, LLC*, supra, 702. The defendant employer in *Thibodeau* employed two individuals. *Thibodeau* v. *Design Group One Architects, LLC*, supra, 695. We concluded that the legislature crafted the act not only to include a principal public policy against sex discrimination, but also a secondary public policy that served as a limitation on the first. See id., 706. The principal policy, advanced by the main text of § 46a-60, prevented discrimination on the basis of sex. Id. The secondary policy, which limited the first, was advanced by the act's limitation of the term " 'employer' " and served to protect this state's smallest employers from the significant burdens associated with the defense of employment discrimination claims. Id., 706–709. Because we determined that the statutory scheme included an explicit limitation to the principal public policy against sex discrimination, and given that the undisputed facts demonstrated that the plaintiff's employer did not meet the limited definition of employer under the act, we concluded that the plaintiff could not advance a common-law wrongful discharge claim premised on public policy in § 46a-60 under those facts. See id., 718.

Both *Burnham* and *Thibodeau* are distinguishable from the present case because they involved statutes in which the legislature explicitly limited the scope of the statute and its public policy. The statutory schemes in *Burnham* and *Thibodeau* included a definition limiting the application of the statute. Here, by contrast, we have no such limitation imposed by the legislature. Section 31-73 was written in "broad and sweeping language"; *Lockwood* v. *Professional Wheelchair Trans-*

Dunn *v.* Northeast Helicopters Flight Services, LLC

*portation, Inc.*, supra, 37 Conn. App. 94–95; and does not include any explicit limitations. In fact, its scope is broadened by the legislature's use of the terms "directly or indirectly" to effectuate the public policy goals expressed in the statute. Therefore, in the absence of any indication that the legislature intended to limit the definition of "representation or . . . understanding," we interpret the statute broadly to effectuate its remedial purpose.

To the extent the defendant contends that, despite this crucial difference between *Burnham* and *Thibodeau* and the present case, our interpretation of § 31-73 (b) unduly broadens the statute, we disagree. Our conclusion, that the phrase "representation or . . . understanding" may contemplate a unilateral understanding or an implicit representation, is applicable in the wrongful discharge setting only when, as here, there is a termination of employment allegedly linked to the demand or request for money. To prevail on a claim of wrongful discharge in violation of the public policy in the statute, the employee still must adduce evidence linking the termination to the demand or request and demonstrating that the employer in fact understood, or intended, that the employee's acquiescence was necessary for continued employment. Such evidence may include proof that, as here, the employee was discharged immediately after rejecting the demand for the sum of money. The employer, however, has the opportunity to rebut the employee's evidence by demonstrating that the termination and the demand or request were unrelated.

We recognize that § 31-73 (b) may have an effect on the pursuit of entrepreneurial affairs between an employer and an employee outside of the employer's primary business pursuits. We note, however, that bona fide entrepreneurial affairs and compensation arrangements between an employer and an employee, and the

Dunn *v.* Northeast Helicopters Flight Services, LLC

lawful exercise of managerial discretion, need not be entirely abandoned. Rather, the statute's purpose is to prevent employers from abusing the significant power imbalance that often exists between employers and employees in the context of the employer's primary business pursuits. The statute prevents employers from using continued employment as a means to coerce employees into fee sharing or other wage sharing arrangements for endeavors outside of the employer's primary business pursuits. This does not interfere with the parties' abilities to develop mutually beneficial arrangements, so long as the continued employment of the employee is not used as a leveraging tactic to achieve it. Moreover, should the legislature decide that § 31-73 (b) sweeps too broadly and chills legitimate business pursuits between employer and employee, it is, of course, free to amend the statute.

We now turn to the facts of this case to determine whether the Appellate Court correctly concluded that the plaintiff cannot prevail on his claim as a matter of law. Viewing the record in the light most favorable to the plaintiff as the nonmoving party, we conclude that it contains sufficient facts on which a reasonable jury could find that the defendant, either directly or indirectly, demanded or requested a sum of money from the plaintiff upon a "representation or . . . understanding" that the plaintiff's compliance with the demand was necessary to continue employment. There is evidence from which a jury could conclude that there was either a unilateral understanding on the part of the defendant that, if the plaintiff did not agree to give the defendant 50 percent of his future FAA examiner earnings, the defendant would terminate the plaintiff's employment, or that the termination of the plaintiff's employment was a representation by the defendant that the plaintiff's acceptance of the demand for 50 percent of the fees was necessary to continue his employment. The fact finder must consider all of the facts, including the rea-

Dunn *v.* Northeast Helicopters Flight Services, LLC

sons for termination proffered by the defendant, to determine whether the termination of the plaintiff's employment reflected or constituted a representation or understanding that accepting the defendant's demand was necessary to continue employment. The record demonstrates that the plaintiff believed that the termination of his employment was due to his refusal to agree to pay the defendant 50 percent of the fees and that the defendant's owner himself noted that the plaintiff's refusal was the "last straw" that resulted in the termination of his employment. The undisputed record also demonstrates that the plaintiff was discharged immediately after he noted to Boulette's wife that he did not use the defendant's credit card for his travel arrangements because he did not want to share the examination fees with the defendant. We believe that a reasonable jury could infer that a "representation or . . . understanding" that accepting the defendant's demand for 50 percent of the examination fees was necessary to continue employment existed. Because material questions of fact remain, we further conclude that the Appellate Court improperly upheld the trial court's decision to grant the defendant's motion for summary judgment. See, e.g., *H.O.R.S.E. of Connecticut, Inc.* v. *Washington*, 258 Conn. 553, 565, 783 A.2d 993 (2001); see also, e.g., *Feliciano* v. *Autozone, Inc.*, 316 Conn. 65, 88, 111 A.3d 453 (2015).

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand the case to the trial court for further proceedings according to law.

In this opinion D'AURIA and ECKER, Js., concurred.

MULLINS, J., with whom ROBINSON, C. J., joins, dissenting. I respectfully dissent. This court has explained

Dunn *v.* Northeast Helicopters Flight Services, LLC

that "[a]n employer violates [General Statutes § 31-73 (b)] whenever it demands any sum of money from an individual to secure employment or continue employment." (Internal quotation marks omitted.) *Mytych* v. *May Dept. Stores Co.*, 260 Conn. 152, 165–66, 793 A.2d 1068 (2002). Thus, the dispositive issue in this case is whether the attempt of the defendant, Northeast Helicopters Flight Services, LLC, to have its employee, the plaintiff, Tim Dunn, agree to share fees he would receive as a Federal Aviation Administration (FAA) certified pilot examiner—fees that constituted unrealized proceeds from a separate business venture, unrelated to any wages or sums of money paid to the plaintiff by the defendant as part of their ongoing employment relationship—legally constituted an act that violated the statute or our public policy articulated therein. For the reasons cogently outlined by the Appellate Court; see *Dunn* v. *Northeast Helicopters Flight Services, LLC*, 206 Conn. App. 412, 432–35, 261 A.3d 15 (2021); I conclude that § 31-73 (b) is inapplicable to the circumstances of this case because any request or demand for future FAA examination fees concerned unrealized funds from a proposed future business venture between the parties.[1]

---

[1] I note that the Appellate Court aptly relied on *Lockwood* v. *Professional Wheelchair Transportation, Inc.*, 37 Conn. App. 85, 87–89, 92–95, 654 A.2d 1252, cert. denied, 233 Conn. 902, 657 A.2d 641 (1995), and *Mytych* v. *May Dept. Stores Co.*, supra, 260 Conn. 165–66, in its analysis. See *Dunn* v. *Northeast Helicopters Flight Services, LLC*, supra, 206 Conn. App. 428–33. In *Lockwood*, the Appellate Court concluded that the defendant employer violated § 31-73 (b) and the public policy expressed therein when it made explicit demands that the plaintiff employee could not return to work unless he paid the defendant $1000 for its insurance deductible, even after the plaintiff had obtained a small claims judgment, in which the small claims court determined that he did not owe the defendant the $1000. See *Lockwood* v. *Professional Wheelchair Transportation, Inc.*, supra, 87–89, 92–95.

On the other hand, in *Mytych*, this court rejected the employees' claim that the employer's calculation of commissions violated § 31-73 (b) because the employer improperly deducted the pro rata share of the retail price of unidentified returns from their gross sales when calculating the commissions. See *Mytych* v. *May Dept. Stores Co.*, supra, 260 Conn. 157–58. The

Dunn *v.* Northeast Helicopters Flight Services, LLC

In particular, I agree with the Appellate Court that "[t]he plaintiff was free to reject the offer, and the defendant, under the at-will employment doctrine, was free to terminate the plaintiff's employment for his decision. The public policy inherent in § 31-73 (b) places a limit on the at-will employment rule only by carving out an exception that prohibits an employer from coercing from an employee financial concessions related to wages by conditioning . . . continued employment on the employee's capitulation to the employer's demands. As the trial court stated, '§ 31-73 (b) does not regulate an employer's reason for [discharging] an employee; it regulates the use of continued employment as leverage to extort a sum of money.' "[2] Id., 434.

Additionally, § 31-73 (b) not only "prohibits an employer from demanding or requesting a sum of money upon the representation or understanding that acceptance of the demand or request is necessary *for continued employ-*

employees claimed that this method of calculating their commissions violated § 31-73 (b) because it constituted a demand or request for a sum of money. See id., 162–63, 165. This court rejected that claim, concluding that the employees had agreed to the terms for calculating their commissions and that the commission agreement itself was not a demand or request for a sum of money. Id., 166. Instead, this court observed, the employer "merely calculated the commissions earned by individual salespersons, taking into account factors such as identified and unidentified returns that alter the total amount of gross sales for which the individual salesperson can claim responsibility." Id.

I agree with the Appellate Court that these prior cases support the conclusion that the defendant's actions in the present case do not fall within the prohibitions of § 31-73 (b).

[2] Although the Appellate Court seems to limit its conclusion to "financial concessions related to *wages*"; (emphasis added) *Dunn* v. *Northeast Helicopters Flight Services, LLC*, supra, 206 Conn. App. 434; I would not so limit it. Instead, in my view, the demand or request by the employer for financial concessions also falls within the prohibitions in § 31-73 (b) if it is a demand or request for a "fee, sum of money or contribution . . . . " General Statutes § 31-73 (b). Here, the defendant did not leverage the plaintiff's employment in an attempt to exact a sum of money. Rather, the plaintiff and the defendant were merely discussing a potential future business venture.

Dunn *v.* Northeast Helicopters Flight Services, LLC

*ment*''; (emphasis added); as the majority points out, but also prohibits an employer from demanding or requesting a sum of money ''upon the representation or the understanding that such refund of wages, fee, sum of money, contribution or deduction is necessary to *secure employment . . . .*'' (Emphasis added.) General Statutes § 31-73 (b). Therefore, the prohibitions in the statute apply equally and in the same manner to securing employment and to continuing employment. See *Lockwood* v. *Professional Wheelchair Transportation, Inc.*, 37 Conn. App. 85, 98, 654 A.2d 1252 (''[t]he public policy embodied in § 31-73 applies to hiring''), cert. denied, 233 Conn. 902, 657 A.2d 641 (1995).

With that understanding in mind, and reading the statute as a whole, I cannot envision how the defendant's actions in the present case violated the public policy embodied in § 31-73 (b). Specifically, if the defendant had proposed the same examination fee sharing agreement to the plaintiff during the hiring process as a compensation scheme, i.e., offering the job as a flight instructor to the plaintiff if he agrees to a 50 percent share of the FAA examination fees, and the plaintiff had rejected the offer and asked to be employed solely as a flight instructor, surely, the defendant would not have violated the statute by declining to hire the plaintiff when the plaintiff rejected the employment offer based on the compensation proposed. I see no real difference under this statute between the request being made during the hiring process, when there is no right to being hired, versus the request being made in the context of at-will employment, when there is no right to continuing in employment. The real issue in either scenario is whether the employer leveraged employment to exact a sum of money. That did not happen under the facts of this case.

Therefore, I cannot conclude that, within the at-will employment relationship, the defendant was prohibited

346 Conn. 360 MARCH, 2023 391

Dunn *v.* Northeast Helicopters Flight Services, LLC

from terminating the plaintiff's employment because the plaintiff rejected the defendant's proposal of future fee sharing. Neither § 31-73 (b) nor the public policy embedded therein prohibits an employer and a prospective employee from negotiating the terms of the employment prior to hiring, and, similarly, § 31-73 (b) does not prohibit an employer and an at-will employee from negotiating the terms of a prospective change to the terms of employment. Such discussions are an essential component of the employment relationship, and the legislature could not have intended § 31-73 (b) to prohibit them.

For the foregoing reasons, I respectfully dissent.