******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

## STATE OF CONNECTICUT *v.* ROBERT LEE NICHOLS
### (AC 46989)

Alvord, Suarez and Westbrook, Js.

*Syllabus*

Convicted of the crimes of assault in the first degree and risk of injury to a child, the defendant appealed to this court. He claimed, inter alia, that the trial court applied an incorrect legal standard in denying his postverdict motion for a new trial, in which he claimed that the verdict was against the weight of the evidence. *Held*:

Contrary to the defendant's contention, the evidence was sufficient to support the jury's verdict finding him guilty of the crimes with which he was charged and that his abuse of the minor victim, an infant, occurred within the applicable statute of limitations (§ 54-193 (c)), as the jury reasonably could have credited the testimony of a witness who had watched the defendant cause the victim to hit his head on a granite countertop, drag the victim on a rug and slam him several times on a floor.

The trial court applied an incorrect legal standard in denying the defendant's motion for a new trial to the extent that the court's statement that it could not reject the jury's findings and substitute its own view of the evidence applied the legal standard used to adjudicate sufficiency of the evidence claims, as the proper inquiry in adjudicating a motion for a new trial required the court to determine if there was a substantial question regarding the reliability of the verdict and to make its own credibility determinations, and the court's summary statement that it agreed with the jury's findings based on the evidence did not alter this court's conclusion that the trial court applied an incorrect legal standard; accordingly, the trial court's denial of the motion for a new trial was reversed and the case was remanded to the trial judge who presided over the trial to make his own assessment of the jury's credibility determinations.

Argued May 19—officially released August 19, 2025

*Procedural History*

Substitute information charging the defendant with two counts of the crime of risk of injury to a child and one count of the crime of assault in the first degree, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *K. Doyle, J.*; verdict of guilty; thereafter, the court denied the defendant's

motions for a judgment of acquittal, in arrest of the judgment and for a new trial, and rendered judgment in accordance with the verdict, from which the defendant appealed to this court. *Reversed in part; further proceedings.*

*Corinne A. Burlingham*, with whom were *Michael S. Taylor* and *Brendon P. Levesque*, for the appellant (defendant).

*Timothy F. Costello*, supervisory assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, and *Michael W. Riley*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Robert Lee Nichols, appeals from the judgment of conviction, rendered following a jury trial, of one count of assault in the first degree in violation of General Statutes § 53a-59 (a) (3) and two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (1). On appeal, the defendant claims that the trial court improperly (1) denied his motion for a judgment of acquittal because there was insufficient evidence for the jury to find him guilty on all counts, and (2) denied his motion for a new trial because the jury's verdict was against the manifest weight of the evidence. We disagree with the defendant's first claim. However, we are persuaded that the court applied an incorrect legal standard in adjudicating the defendant's motion for a new trial. Accordingly, we reverse the court's denial of the motion for a new trial and remand the case to the trial court, *K. Doyle, J.*, for a new determination on that motion. The judgment is affirmed with respect to the defendant's claim that the evidence was insufficient to support his conviction.

The following facts, which the jury reasonably could have found, and procedural history are relevant to our

disposition of the defendant's claims. The defendant and his wife (collectively, Nichols) were pastors of a small congregation and operated a day care out of their house. The minor victim[1] was born in October, 2012. The victim's parents, R and D, attended services at the defendant's congregation and enrolled the victim in the defendant's day care. The Nichols and H,[2] another person who attended services at the defendant's congregation and who lived with the Nichols, were the only people who worked at the day care. The Nichols also watched the victim outside of the regular day care hours.

During August, 2013, R and D fell ill, which led to the victim, who was approximately nine or ten months old at the time, having an extended stay of about ten days (extended stay) at the Nichols' house.[3] At the beginning of the victim's extended stay, the defendant

---

[1] In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

[2] R, D and H were raised in a religion that viewed women as subservient to men. R and H believed they had to submit to the authority of their husbands and pastors.

[3] D and R provided inconsistent testimony about why the Nichols watched the victim during the extended stay. D testified that the Nichols wanted to keep the victim in order to teach him how to be more obedient, whereas R testified that the Nichols were concerned that the victim would catch the illness if they took him home.

Initially, R testified that the Nichols watched the victim in August, 2013. Although R and D testified that the stay could have been in July, 2013, and H initially testified that she did not remember the exact dates of the extended stay and that it might have been in the fall of 2013, H later testified that the stay began on August 10, 2013, because she had a photo with that date and recalled that the photo was taken the first day of the extended stay.

placed the victim, several times, in a sink filled with cold water and ice cubes. The defendant used the sink faucet sprayer to spray water over the victim's head, causing the victim to flail and gasp for air.[4] On one of these occasions, the victim flailed, fell backward, and hit his head on a granite countertop.

Other incidents occurred during the victim's extended stay. The defendant slapped and hit the victim, causing the victim to have bruises on his legs. Also, the defendant very roughly put the victim into a playpen, making a "thud" sound, and placed pillows on either side of the victim in order to force him to sit upright. In addition, the defendant tightly swaddled the victim. One time, the defendant tightly wrapped the victim, took him by the legs, flipped him over, and dragged him along a carpeted floor. While the victim was still wrapped, the defendant hit the victim on the floor about three to four times.[5] After those incidents, the victim had marks on his head and bruises.

After R and D recovered from their illnesses, they attended a service at the defendant's church. The defendant did not allow R and D to see the victim at that time because, according to the defendant, the victim was rebellious.[6] The victim was returned to R and D

---

[4] During trial, H testified that the victim had not been standing up when the defendant commanded him to do so, and the defendant "was trying to prove to me, like, he . . . said to me . . . see, look . . . if [the victim] can't breathe, if [the victim is] fighting for his life, [the victim] can do it. So, that means [the victim] knows how to do it and he's being rebellious. And so, [the defendant] was trying to prove that [the victim] knew how to do it, but [the victim] wasn't because, if he was fearing for his life, he would do it."

[5] H testified: "I heard the thud of [the victim's] head on the floor. . . . [I]t was a carpeted floor, but not like a plush, thick carpet. It's like that thin . . . kind of carpet that's knit very tightly. . . . And it was in the living room where we had a lot of the day care time."

[6] The defendant told R that the victim's "rebellious behavior was because of [her], because [she] was rebellious, and [she] had passed that on to [her] son."

after being with the Nichols for about ten days.[7] When the victim was returned to his parents, R and D noticed that the victim seemed off and did not seem to be himself.[8] R saw bruises on the victim's legs. R wanted to take the victim to a doctor, but D did not allow her to do that. Following the extended stay, the victim would cry whenever R dropped him off at day care or passed him to the defendant.

In September, 2013, R, D and the victim left the apartment in which they had been living and moved into the defendant's basement. D's sister helped R and D move out of the apartment. At the time, D's sister did not see any bruises or cuts on the victim, but the victim appeared cross-eyed[9] and would put his head down and keep it down when he was on the floor.

On October 9, 2013, a pediatrician examined the victim during a routine wellness visit. During this twelve month wellness visit, the pediatrician observed that the

---

[7] H testified that the defendant "seemed very concerned that [R] would see [the bruises]. And he said that [they] had to keep [the victim] until the bruises went away so she wouldn't see it because he was concerned . . . she wouldn't understand how necessary this was and she would say something to the doctor. . . . He thought it was necessary because he was convinced that [the victim] had a rebellious spirit and that it was Satan's attack, and that he had to get it out of [the victim]." In addition, H "was very strictly told not to take any photos of [the victim] once [the victim] had the bruises and his eyes were crossed." During the victim's extended stay, H did not report the incidents to R or to the police "[b]ecause I was afraid if I went against [the defendant], who was my pastor and the one who was my authority, that I would be going against God, and then I would be vulnerable to Satan attacking me. . . . I was also afraid of my life and what [the defendant] would do to me. If he was capable of doing that to a small infant, I was very scared to stand up to him because, if I had ever tried in the past, it resulted in verbal yelling and screaming at me. And so, I was very afraid to attempt speaking up about it."

[8] R testified that the victim "was not as happy as he normally was" and "look[ed] more pale whenever he would vomit, which would happen periodically after he came home." D testified that the victim looked "somber" and "malnourished. . . . [The victim's] face color was different."

[9] D's sister testified that the victim did not appear cross-eyed on prior visits.

victim had experienced abnormal head growth. At the victim's nine month wellness visit, his head had normal measurements; there had been an abrupt and abnormal acceleration in the victim's head growth in the three month interval between the two wellness visits. As a result, the pediatrician ordered an ultrasound for the victim. The ultrasound was done on October 14, 2013, and the victim was sent home following the procedure. Upon receiving the radiology results, which showed fluid in the victim's head, the pediatrician notified authorities of suspected child abuse and called R and D to schedule an MRI scan for the victim. R and D decided against scheduling an MRI.[10] However, the victim was transported to a hospital by ambulance that night, where he later underwent an MRI scan.

R gave two statements to Detective Kerri Rosa of the Manchester Police Department during the victim's hospitalization.[11] D was present each time R was interviewed by Rosa, and R was not allowed to meet with Rosa outside the presence of D. In addition, the defendant coached R before her meeting with Rosa. R provided one written statement on October 15, 2013, in which she stated that she "[did] not know of anything that could have caused a serious injury to [the victim]." On October 16, 2013, R gave a second statement to Rosa. In that statement, she provided examples of how the victim may have been injured, such as by a wave

---

[10] The defendant advised R and D to ensure that their insurance would cover the MRI. R and D contacted the insurance company, which told them a referral was required. The pediatrician would not provide a referral, so R and D did not schedule the MRI. R testified that "[t]he way it was communicated at [the victim's] well visit was . . . it was all precautionary anyways." R further testified that she did not believe that the victim's condition was serious at the time. She then left for work that night. D testified that, at that time, the defendant told R and D that they should pray over the victim, that the fluid would dissipate, and that their insurance might not cover the procedure.

[11] D also gave a statement to the police.

hitting the victim while they were in Florida, and an incident in which the victim hit his head after R fell backward when taking the victim out of a car. Although the defendant was not present when R gave her statements to Rosa, the defendant had prompted R to respond to the detective's questions with those examples.[12]

H also gave a statement to Rosa on October 15, 2013. H had spoken to and was instructed by the defendant before she gave the statement.[13] In that statement, she recounted that she did not notice any abnormal behavior by or injuries to the victim and that she did not see the victim act in a way to make her believe that he had been abused.

The victim's MRI results showed that he had subdural hematomas around his brain and blood in another layer of tissues near his brain. On October 17, 2013, the victim underwent surgery to relieve pressure on his brain. The treatment providers conducted a six month long

---

[12] The defendant gave statements to Rosa on October 15 and 16, 2013. In his October 16 statement, the defendant recalled that he "was bathing [the victim] in [his] kitchen sink, and [he] went to rinse [the victim] off with the water and [the victim] jerked backward, striking the back of his head on the granite kitchen countertop that surrounds the sink." The defendant also noted that "[R] recalled two different situations. One . . . was when we were all vacationing together in Florida. [R] said her and [D] had brought [the victim] to the beach, and a wave hit him. And the other incident happened when she was getting him out of the car. [R] explained that . . . within the last couple weeks, she was getting him out of the car, and she lost her balance and stumbled backward. [R] said [the victim] struck his forehead on the car's doorframe and grab bar area."

[13] H testified that the defendant had told her that "[Rosa] was, essentially, like, I believe he called [Rosa] Satan multiple times. Or she was of Satan. Or working on Satan's behalf. She was, like, evil." H also testified that, after she provided her statement to Rosa, the defendant told her that "people are never going to understand the ways of God or understand disciplining children. They're not going to understand that this is a spiritual attack of Satan. They're not going to understand the ways of God or how you discipline children."

assessment of the victim. Subdural hematomas are commonly caused by trauma but can result from rare medical causes. The treatment providers believed it was more likely than not that the injuries were the result of abusive head trauma because the injuries were unexplained.[14]

Because of the victim's injuries, R and D lost custody of the victim. The victim was placed in foster care by the Department of Children and Families while R and D continued living in the Nichols' house. R, however, eventually left the defendant's church, moved out of the Nichols' house, and separated from her husband. The victim was returned "full-time [to her] care" in June, 2014. H left the Nichols' house in December, 2016.

In June, 2018, H told R about what had happened to the victim. H then gave a statement to the police, in which she described the defendant's assault on the victim.[15] On June 4, 2018, R provided her third statement to the police.[16] In the 2018 statement, R described how she and D had fallen ill in August, 2013, the Nichols took the victim, and she and D were not allowed to see the victim for about ten days. D also gave a statement to the police in 2018.

---

[14] Nina Livingston, a pediatrician specializing in child abuse, testified that the treatment providers "originally, during [their] evaluation, said that [the injuries] were suspicious for physical abuse. . . . [They] could not find a medical reason for these collections [of blood in the victim's brain]. And there were many things, including this head growth chart, that pointed to some event occurring between nine and twelve months of age." In addition, she opined that the injury had taken place more than one week before the victim was treated at the hospital.

[15] H testified that her 2018 statement was different from her 2013 statement "[b]ecause, in 2013, I was so afraid of disobeying [the defendant]. And he told me what to say, and I felt that I had to obey him because he was the man of God. He was my authority. And I was too scared to tell the truth. And I just said exactly what he told me to say."

[16] R testified that she gave that statement because "[t]he case was being revisited. [H] had come forward and [R] felt at that time [that she] was free to speak for [herself]."

Thereafter, the defendant was arrested and charged by way of a substitute long form information with one count of assault in the first degree in violation of § 53a-59 (a) (3) and two counts of risk of injury to a child in violation of § 53-21 (a) (1). A jury trial was held in June, 2023.

When the state rested its case, defense counsel orally moved for a judgment of acquittal on the ground that there was "not enough evidence that would reasonably permit a finding of guilty on all the charges." Specifically, although defense counsel did not dispute that someone had injured the victim, he argued that there was insufficient evidence identifying the defendant as the perpetrator. In addition, defense counsel moved for a judgment of acquittal on the ground that the state had not commenced this case within the five year statute of limitations; see part I of this opinion; arguing that there was conflicting evidence from H regarding the start date of the victim's extended stay.[17] The trial court denied the motion, concluding that there was sufficient evidence "to find the defendant guilty and to avoid the statute of limitations claim."

The jury found the defendant guilty on all counts. On June 30, 2023, the defendant filed three motions. The defendant filed a motion for a judgment of acquittal on all counts on the ground that the evidence was insufficient to permit a finding of guilt beyond a reasonable doubt. The defendant filed a motion in arrest of judgment on the ground that the court lacked jurisdiction because the prosecution did not commence within the statute of limitations. The defendant filed a motion for a new trial on all counts on the ground that the verdict was against the weight of the evidence. Following argument, the trial court denied all three motions in an oral decision. On August 16, 2023, the court sentenced the

---

[17] See footnote 3 of this opinion.

defendant to a total effective term of twenty years of incarceration, execution suspended after ten years, followed by five years of probation. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that there was insufficient evidence to support his conviction. Specifically, he argues that the evidence was insufficient to establish that he committed the alleged conduct or, in the alternative, that the evidence was insufficient to establish that the conduct occurred within the statute of limitations because "the only evidence of the defendant's involvement in the injuries sustained by [the victim] came from a single, highly incredulous witness—[H]." We are not persuaded.

We begin with the well settled standard governing our review of the defendant's claim that his conviction was predicated on insufficient evidence. "In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . .

"While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted

to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . .

"Furthermore, we are mindful that [w]e do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record." (Citation omitted; internal quotation marks omitted.) *State* v. *Douglas C.*, 195 Conn. App. 728, 735–36, 227 A.3d 532 (2020), aff'd, 345 Conn. 421, 285 A.3d 1067 (2022).

Next, we set forth the relevant statutory language. Section 53a-59 (a) provides in relevant part that "[a] person is guilty of assault in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . ." Section 53-21 (a) provides in relevant part that "[a]ny person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of . . . a class C felony for a violation of subdivision (1) . . . ." In addition, with the exception of certain crimes identified in General Statutes § 54-193 (a), "[n]o person may be prosecuted for any offense . . . for

which the punishment is or may be imprisonment in excess of one year, except within five years next after the offense has been committed."[18] General Statutes § 54-193 (c).

The defendant's insufficiency of the evidence claim is premised on his contention that the jury could not reasonably have relied on the testimony of the sole eyewitness, H. Specifically, the defendant argues that "[n]o reasonable fact finder could have relied on [H's] claims" because H "is an admitted liar who has proven [that she would] lie to law enforcement and when under penalty of perjury"; "[H's] testimony that she was sexually assaulted by the defendant was contrary to objective contemporaneous records from [H]";[19] and "H has several demonstrated motives for lying, which are to exact revenge against the defendant and personally profit in the process."[20] The defendant also argues, on the ground that H's testimony was unreliable, that the evidence was insufficient because it failed to establish that the crimes occurred within the statute of limitations.

Construing the evidence in the light most favorable to sustaining the verdict, we conclude that the jury reasonably could have found that the victim had been injured by the defendant during his extended stay with the defendant in his home in the days following August 10, 2013. From H's testimony, in conjunction with evidence that the victim had acted differently after his

[18] Detective Claire Hearn testified that a judge had signed the arrest warrant for the defendant on August 10, 2018. The state was required to prove that the defendant's crimes occurred on or after August 10, 2013.

[19] The defendant points to evidence that H had a sexual relationship with the defendant and his wife. He argues that H, despite claiming that she had been sexually abused by the defendant, told another pastor that she liked having sex with the defendant "in the moment" and grew to have feelings for the defendant.

[20] The defendant argues that H was retaliating against the defendant for a $22,000 debt she had incurred, which she blamed the defendant for, and capitalizing on her story by appearing in podcasts and writing a book.

extended stay and sustained life-threatening head injuries requiring surgery in October, 2013, the jury was permitted to infer that the defendant had wilfully caused serious physical injuries to the victim. See, e.g., *State v. Franklin*, 162 Conn. App. 78, 89, 129 A.3d 770 (2015) ("[t]he credited testimony of even a single witness may be sufficient to sustain a defendant's conviction" (internal quotation marks omitted)), cert. denied, 321 Conn. 905, 138 A.3d 281 (2016).

The jury could have reasonably found the following facts on the basis of H's testimony. In the days after August 10, 2013, the victim had an extended stay at the Nichols' house. During the extended stay, H saw the defendant place the victim in an ice bath in the kitchen sink and spray the victim with cold water, causing the victim to flail and hit his head on a granite countertop. At that time, the defendant stated that he believed the victim was being "rebellious" because the victim was not following his commands. Also during the extended stay, as H testified, the defendant, "wrapped [the victim] very tightly and took [the victim] by his legs and flipped him over and dragged him. So, he had a rug burn on his head, and [the defendant] slammed him on the floor like three or four times with, like, a loud thud sound." Following these incidents, the victim had marks on his head and bruises on his legs, which the defendant concealed from R by keeping the victim for about ten days.

Although the defendant presented evidence to impeach H's credibility,[21] "it is the function of the jury to consider the evidence and [to] judge the credibility of witnesses." (Internal quotation marks omitted.) *State v. Williams*, 350 Conn. 363, 374, 324 A.3d 760 (2024); see *State* v. *A. M.*, 156 Conn. App. 138, 145, 111 A.3d 974 (2015) ("[Q]uestions of whether to believe or to

---

[21] See footnotes 19 and 20 of this opinion.

disbelieve a competent witness are beyond our review. . . . Our review of factual determinations is limited to whether those findings are clearly erroneous. . . . We must defer to the [finder] of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.)), aff'd, 324 Conn. 190, 152 A.3d 49 (2016). Accordingly, we conclude that there was sufficient evidence to support the jury's verdict.

II

The defendant also claims that the trial court applied an incorrect legal standard in denying his motion to set aside the verdict as against the weight of the evidence. We agree with the defendant.

We begin by setting forth the standard of review applicable to the defendant's claim. Because the defendant's claim challenges the legal standard applied by the trial court, it is subject to plenary review. See, e.g., *State* v. *Hughes*, 341 Conn. 387, 414, 267 A.3d 81 (2021) ("[i]nsofar as the defendant's claims [challenging the court's ruling on the motion for new trial] bear on the proper legal standard, they are subject to plenary review").

Our analysis is guided by the following principles. "[A] challenge to the weight of the evidence is not the same as a challenge to the sufficiency of the evidence. A sufficiency claim dispute[s] that the state presented sufficient evidence, if found credible by the jury, to sustain [the defendant's] conviction. . . . In contrast, a weight claim does not contend that the state's evidence . . . was insufficient, as a matter of law, to establish the defendant's guilt beyond a reasonable doubt. . . . Rather, [it] asserts that the state's case . . . was so flimsy as to raise a substantial question regarding the reliability of the verdict [and that there

was a] serious danger that [the defendant] was wrongly convicted. . . .

"Given that these two types of claims raise fundamentally different issues, the inquiry appropriately undertaken by a court ruling on a sufficiency of the evidence claim differs substantially from that of a court ruling on a weight of the evidence claim. In reviewing the sufficiency of the evidence, a court considers whether there is a reasonable view of the evidence that would support a guilty verdict. . . . In doing so, the court does not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . [It] cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . . Thus, a court will not reweigh the evidence or resolve questions of credibility in determining whether the evidence was sufficient. . . .

"In contrast, a court determining if the verdict is against the weight of the evidence does precisely what a court ruling on a sufficiency claim ought not to do. That is, the court must do just what every juror ought to do in arriving at a verdict. The juror must use all his experience, his knowledge of human nature, his knowledge of human events, past and present, his knowledge of the motives which influence and control human action, and test the evidence in the case according to such knowledge and render his verdict accordingly. . . . The trial judge in considering the verdict must do the same . . . and if, in the exercise of all his knowledge from this source, he finds the verdict to be so clearly against the weight of the evidence in the case as to indicate that the jury did not correctly apply the law to the facts in evidence in the case, or were governed by ignorance, prejudice, corruption or partiality, then it is his duty to set aside that verdict and to grant a new trial. . . . In other words, the court

specifically is required to act as a [seventh] juror because it must independently assess [the] credibility [of witnesses] and determine the weight that should be given to . . . evidence. . . .

"Thus, because a court is required to independently assess credibility and assign weight to evidence, a weight of the evidence claim necessarily raises the issue of which courts are competent to perform those tasks. It is well settled that only the judge who presided over the trial where a challenged verdict was returned is legally competent to decide if that verdict was against the weight of the evidence . . . . Consequently, a judge in a later proceeding, such as a direct appeal or a habeas corpus proceeding, is not legally competent to decide such a claim on the basis of the cold printed record before it. . . . The rationale behind this rule is sound: [T]he trial court is uniquely situated to entertain a motion to set aside a verdict as against the weight of the evidence because, unlike an appellate court, the trial [court] has had the same opportunity as the jury to view the witnesses, to assess their credibility and to determine the weight that should be given to their evidence. . . . [T]he trial judge can gauge the tenor of the trial, as [an appellate court], on the written record, cannot, and can detect those factors, if any, that could improperly have influenced the jury." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Capasso*, 203 Conn. App. 333, 345–47, 248 A.3d 58, cert. denied, 336 Conn. 939, 249 A.3d 352 (2021); see also *State* v. *Soto*, 175 Conn. App. 739, 745–48, 168 A.3d 605, cert. denied, 327 Conn. 970, 173 A.3d 953 (2017).

The following procedural history is relevant to our review of the defendant's claim. As set forth previously, the defendant filed three postverdict motions: a motion for a judgment of acquittal on all counts, a motion in arrest of judgment, and a motion for a new trial on all counts. In an oral decision, the trial court denied the

motions, concluding that, "[i]n all three of the motions, defense essentially are arguing that this court should sit as a ninth juror and reject the jury's factual findings. This court cannot reject the jury's findings and substitute its own view of the evidence. The jury's verdicts are supported by the evidence, and the jury found [H] credible and that she lacked any motive to falsely accuse the defendant, who, at one point, acted as her father and spiritual leader. The jury rejected the inference raised by the defense that [H] would come forward and lie and expose herself to being charged almost five years after the incident. This court agrees with the jury's findings that were based on the evidence presented in this matter and, therefore, denies all of the defendant's motions."

We conclude that the trial court applied the incorrect legal standard relative to the motion for a new trial. First, we note that nowhere in the court's oral decision did it expressly state the legal standard applicable to the defendant's motion for a new trial. Cf. *In re Xavier H.*, 201 Conn. App. 81, 100, 240 A.3d 1087 (when court correctly set forth legal standard elsewhere in its memorandum of decision, imprecision in conclusory statement did not reflect application of incorrect legal standard), cert. denied, 335 Conn. 981, 241 A.3d 705 (2020), and cert. denied, 335 Conn. 982, 241 A.3d 705 (2020). To the contrary, the legal standard set forth by the court at the beginning of its analysis to apply to all three motions stated that "[t]his court cannot reject the jury's findings and substitute its own view of the evidence." To the extent the court applied the standard used for sufficiency of the evidence claims to the defendant's claim that the verdict was against the weight of the evidence, such an application was improper. See *State v. Capasso*, supra, 203 Conn. App. 345 ("[T]he inquiry appropriately undertaken by a court ruling on a sufficiency of the evidence claim differs substantially from

that of a court ruling on a weight of the evidence claim. In reviewing the sufficiency of the evidence . . . the court does not sit as a [seventh] juror who may cast a vote against the verdict." (Internal quotation marks omitted.)). In contrast, "[a] weight claim predicated on a challenge to the jury's credibility determinations . . . requires the trial court to make its own assessment of the jury's credibility determinations." *State* v. *Soto*, supra, 175 Conn. App. 755.

Although the trial court concluded its oral decision by noting its "agree[ment] with the jury's findings that were based on the evidence presented in this matter," that summary statement alone does not alter our conclusion that the court applied an incorrect legal standard. Accordingly, we must reverse the court's determination on this issue and remand the case to the judge who presided over the trial[22] to "make [his] own assessment of the jury's credibility determinations." *State* v. *Soto*, supra, 175 Conn. App. 755.

The denial of the motion for a new trial is reversed and the case is remanded to the trial court, *K. Doyle, J.*, for a determination, on the existing record, of the motion for a new trial; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

---

[22] We recognize that Practice Book § 1-22 (a) provides in relevant part: "A judicial authority shall, upon motion of either party or upon its own motion, be disqualified from acting in a matter . . . because the judgment was reversed on appeal. . . ." However, considering the procedural posture of this case and the factual determination to be made, the determination required on remand must be made by the same trial judge. See, e.g., *State* v. *Phillips*, 102 Conn. App. 716, 739 n.19, 927 A.2d 931 (reversing denial of motion for new trial and remanding case to same trial judge for determination as to whether there was racial bias on part of juror against defendant), cert. denied, 284 Conn. 923, 933 A.2d 727 (2007); *State* v. *Soto*, supra, 175 Conn. App. 748 ("[i]t is well settled that *only the judge who presided over the trial* where a challenged verdict was returned is legally competent to decide if that verdict was against the weight of the evidence" (emphasis in original; internal quotation marks omitted)).